# EXHIBIT 1

MATTHEW D. CHURCH #15574
TAYLOR P. KORDSIEMON #17257
**MANNING CURTIS BRADSHAW**
**& BEDNAR PLLC**
201 South Main Street, Suite 750
Salt Lake City, Utah 84111
(801) 363-5678
mchurch@mc2b.com; tkordsiemon@mc2b.com
*Attorneys for Orem City*

<div align="center">

IN THE UNITED STATES DISTRICT COURT
IN AND FOR DISTRICT OF UTAH, CENTRAL DIVISION

</div>

| | |
|---|---|
| UPPER VALLEY UTILITIES, LLC, a Utah limited liability company,<br><br>      Plaintiff,<br><br>v.<br><br>OREM CITY, a municipal corporation, and JOHN DOES I-X,<br><br>      Defendants. | **DECLARATION OF CHRISTOPHER R. TSCHIRKI IN SUPPORT OF OREM CITY'S OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>Case No. 2:23-cv-00777-CMR<br><br>Magistrate Judge Cecilia M. Romero |

CHRISTOPHER R. TSCHIRKI declares as follows:

1.      I am over the age of eighteen and have personal knowledge of the following.

2.      I have been employed as the Public Works Director for Orem City since March 6, 2011.

3.      On December 11, 1996, Orem City entered into the Conduit Agreement with Upper Valley Utilities ("UVU"). *See generally* Conduit Agreement [Dkt. No. 7-1].

4.      Through the Conduit Agreement, Orem City contracted with UVU to install a conduit system consisting of four separate trenches (the "Greater Conduit System"). *Id.* ¶ 3.2.

5.      Each of the trenches in the Greater Conduit System contain multiple conduits, and the Conduit Agreement divided ownership of those conduits among several entities, including Orem City, UDOT, UVU, NextLink, ELI, and PFT. *Id.* ¶¶ 4.1–4.1.6.

6.      The Conduit Agreement provided that certain 1-¼-inch conduits and 2-inch conduits would be owned and maintained solely by Orem City. *Id.* ¶ 4.1.4.

7.      The Conduit Agreement provided that UVU would solely own and maintain certain 2-inch conduits for a period of 99-years, after which ownership of those conduits would transfer to the City. *Id.* ¶¶ 4.1.5, 4.2.

8.      The Conduit Agreement also provided that Orem and UVU would jointly own and maintain certain 1-¼-inch conduits for a period of 99-years, after which the City would assume sole ownership of those conduits. Id. ¶¶ 4.1.6, 4.2.

9.      The "UVU Conduit System" is a subpart of the Greater Conduit System, consisting of all the conduits within the Greater Conduit System in which Plaintiff has a sole or joint 99-year ownership interest.

10.     Each of the trenches in the Greater Conduit System contains groupings of four 1-¼-inch conduits called "quadlocks." *Id.* ¶ 4.1.

11.     Trench #3 in the Greater Conduit System contains four quadlocks. The upper two quadlocks contain conduit numbers eleven through eighteen, all of which were owned solely by Orem City. *Id.* at UVU P. 0023.

12.     In or about May 2000, Orem City undertook the "Center Street Fiber Optic Conduit Pullbox Project" ("Center Street Project"). *See* Center Street Project Plans, attached as Exhibit A.

13.     The Center Street Project involved completing "pullouts" of the top two quadlocks contained in Trench #3. *Id.* at 6; *see also* Conduit Agreement [Dkt. No. 7-1] at UVU P. 0023.

14.     It is my understanding that each of the conduits involved in Brooks Fiber sale, the TCG Utah sale, the CenturyLink sale, the First Digital lease, and the UTOPIA lease are located within the quadlocks that were pulled as part of the Center Street Project or other conduits that are owned solely by the City. *See* Brooks Fiber Sale A-1998-0165, attached as Exhibit B; TCG Utah Sale A-2011-0031, attached as Exhibit C; CenturyLink Sale A-2014-0177, attached as Exhibit D; First Digital Lease A-2017-0169, attached as Exhibit E; UTOPIA Lease A-2006-0336, attached as Exhibit F.

15.     I have not been able to locate any records indicating that any of the conduits contained within the UVU Conduit System have ever been pulled, which must be done before a conduit can be used.

16.     To the best of my knowledge, Orem City has never sold, leased, transferred, taken, or otherwise used any of the conduits within the UVU Conduit System.

I declare under criminal penalty under the law of Utah that the foregoing is true and correct.

DATED April 29, 2024 in Utah County, Utah.


_Christopher R. Tschirki_
Christopher R. Tschirki

# EXHIBIT A

# CITY OF OREM, DEPARTMENT OF PUBLIC WORKS

*Drawings for the construction of*

# CENTER STREET FIBER OPTIC CONDUIT PULLBOX PROJECT

MAY 2000



CITY OF OREM



DEPARTMENT OF PUBLIC WORKS
ENGINEERING DIVISION
DESIGN SECTION
955 NORTH 900 WEST
OREM, UTAH 84057
(801) 229-7500

## PROJECT VICINITY MAP



2000 NORTH STREET
1600 NORTH STREET
1200 NORTH STREET
800 NORTH STREET
400 NORTH STREET
CENTER STREET
400 SOUTH STREET
800 SOUTH STREET
1200 SOUTH STREET
1600 SOUTH STREET
2000 SOUTH STREET

1600 WEST STREET
1200 WEST STREET
800 WEST STREET
400 WEST STREET
MAIN STREET
400 EAST STREET
800 EAST STREET
1200 EAST STREET

PROJECT VICINITY

## SYMBOLS

|  | EXISTING STRUCTURE OR FACILITY |
|---|---|
| — — — — | EXISTING PIPELINE & UTILITIES |
|  | NEW PIPELINE |
| ○ | EXISTING MANHOLE |
| ● | NEW MANHOLE |
| ⊕ | EXISTING WATER VALVE |
| ⋈ | NEW WATER VALVE |
| ♂ | EXISTING FIRE HYDRANT |
| ✦ | NEW FIRE HYDRANT |
| ⊨ | NEW WATER TEE |
| ✱ | NEW WATER COUPLER |
| ▶| | NEW WATER REDUCER |
| ⤙ | NEW WATER BEND |
| ⊦⊣ | NEW WATER CROSS |
| ] | NEW WATER PLUG |

## ABBREVIATIONS

| | | | |
|---|---|---|---|
| AC | ASPHALT CONCRETE | P | POLE, POWER |
| | | PC | POINT OF CURVATURE |
| BC | BEGIN CURVE | PI | POINT OF INTERSECTION |
| BCR | BEGIN CURVE RETURN | POC | POINT ON CURVE |
| BM | BENCH MARK | PRV | PRESSURE REGULATING VALVE |
| BVC | BEGIN VERTICAL CURVE | PT | POINT OF TANGENCY |
| | | PVC | POLYVINYL CHLORIDE |
| CB | CATCH BASIN | | |
| CG | CURB & GUTTER | R/W | RIGHT OF WAY |
| CI | CAST IRON | | |
| CMP | CORRUGATED METAL PIPE | SD | STORM DRAIN |
| CO | CLEANOUT | SS | SANITARY SEWER |
| CONC | CONCRETE | STA | ENGINEERING STATION |
| CP | CONTROL POINT | SW | SIDEWALK |
| CTV | CABLE TV | | |
| | | T | TELEPHONE |
| DI | DUCTILE IRON | TC | TOP OF CURB |
| | | TW | TOP OF WALK |
| EC | END CURVE | TYP | TYPICAL |
| ECR | END CURVE RETURN | | |
| EL | ELEVATION | W | WATER |
| EOA | EDGE OF ASPHALT | | |
| EVC | END VERTICAL CURVE | | |
| | | | |
| FH | FIRE HYDRANT | | |
| FL | FLOW LINE | | |
| | | | |
| G | GAS | | |
| | | | |
| INV | INVERT ELEVATION | | |
| IRR | IRRIGATION | | |
| | | | |
| LOG | LIP OF GUTTER | | |
| | | | |
| MH | MANHOLE | | |
| | | | |
| NIC | NOT IN CONTRACT | | |
| NTS | NOT TO SCALE | | |
| | | | |
| OC | ON CENTER | | |
| OD | OUTSIDE DIAMETER | | |

## DRAWING INDEX

| NUMBER | TITLE |
|---|---|
| 1 | TITLE SHEET |
| 2 | GENERAL INFORMATION |
| 3 | PLAN SHEET #1 |
| 4 | PLAN SHEET #2 |
| 5 | PLAN SHEET #3 |
| 6 | DETAIL SHEET #1 |
| 7 | DETAIL SHEET #2 |
| 8 | DETAIL SHEET #3 |

## LOCATION MAP

## GENERAL NOTES

## DETAIL IDENTIFICATION

EXAMPLE:

DETAIL 'A' IS CALLED OUT BELOW ON DRAWING SHEET 3:

```
    A
    6
```

DETAIL LETTER

DETAIL SHEET ON WHICH
DETAIL APPEARS*

ON DETAIL SHEET 6, DETAIL 'A' IS IDENTIFIED AS:

DETAIL LETTER

DETAIL
```
    A
    3
```

DRAWING SHEET ON WHICH
DETAIL APPEARS*

*NOTE:  IF THE DETAIL CALL-OUT AND THE DETAIL ARE SHOWN
ON THE SAME SHEET, THEN THE SHEET NUMBER IS
REPLACED BY A LINE

### CITY OF OREM

DEPARTMENT OF PUBLIC WORKS
ENGINEERING DIVISION
DESIGN SECTION
955 NORTH 900 WEST
OREM, UTAH 84057
(801) 229-7500

SIGNATURE BLOCK

APPROVAL CITY ENGINEER:

APPROVAL P.W. DIRECTOR:

Richard B. Manning

DESIGN: CY/KL

DATE: MAY 2000

CENTER STREET FIBER OPTIC
CONDUIT PULLBOX PROJECT

PROJECT NUMBER: 45-7531-731-462

GENERAL INFORMATION

SHEET: 2/8

LICENSED PROFESSIONAL ENGINEER
CHRISTOPHER ROBERT TSCHINKI
No. 366401
STATE OF UTAH









MATCHLINE B
STRATTON DITCH
400 WEST
220 WEST
CENTER STREET
OREM BLVD.
MATCHLINE C
LICENSED PROFESSIONAL ENGINEER
CHRISTOPHER ROBERT TSCHIRKI
No. 366401
STATE OF UTAH
100 0 50 100 200 400
OREM
CITY
CENTER
STATE STREET
CENTER STREET
MATCHLINE C
MATCHLINE D
LICENSED PROFESSIONAL ENGINEER
CHRISTOPHER ROBERT TSCHIRKI
No. 366401
STATE OF UTAH
100 0 50 100 200 400
APPROVAL RECOMM.
5-24-2000
DATE
CITY ENGINEER
APPROVED
24 May 00
DATE
PUBLIC WORKS DIRECTOR
DESIGN CT/KL MAY 2000
DRAWN CT MAY 2000
CHECKED KL MAY 2000
DATE
REV DATE BY DESCRIPTION
OREM
CITY OF OREM
DEPARTMENT OF PUBLIC WORKS
ENGINEERING DIVISION
955 NORTH 900 WEST
OREM, UTAH 84057
CENTER STREET FIBER OPTIC CONDUIT PULLBOX PROJECT
45-7531-731-462
X:\TRAFFIC\CENTER FIBER\DWG\CENTER FIBER.DWG
PLAN SHEET #2
SHEET: 4/8

NOTES:

1) FROM 1200 WEST TO STATE STREET, 4 QUADS EXIST IN THE TRENCH. FROM STATE STREET TO PALISADE DR., 3 QUADS EXIST IN THE TRENCH. FROM 1200 WEST TO PALISADE DR., 2 - 2" PVC CONDUITS EXIST IN THE BOTTOM OF THE TRENCH.

2) ONE QUAD HAS 4 - 1-1/4" PVC CONDUITS.

3) DETAIL "A1" IS THE SAME AS DETAIL "A" WITH THE EXCEPTION THAT THE CROSS SECTION IS 2' CURB AND GUTTER, LANDSCAPE, AND THEN 4' SIDEWALK. THE F1 BOX SHALL BE INSTALLED BEHIND THE BACK OF CURB IN THE LANDSCAPE AREA.

4) DETAIL "A2" IS THE SAME AS DETAIL "A" WITH THE EXCEPTION THAT THE F1 BOX WILL BE INSTALLED IN A CONCRETE SIDEWALK, AND THE SIDEWALK SECTION SHALL BE REPLACED WITHOUT CURB AND GUTTER AND ASPHALT RESTORATION.

LICENSED PROFESSIONAL ENGINEER CHRISTOPHER ROBERT TSCHIRKI No. 366401 STATE OF UTAH

TYPICAL CROSSING AND PULLOUT DESIGN [A]
N.T.S.

PULLOUT TRENCH CROSS SECTION [B-1]
N.T.S.

NOTES:

1) QUADS "A" AND "B" ARE OWNED BY THE CITY OF OREM. QUADS "C" AND "D" ARE OWNED BY PRIVATE COMPANIES. THE CONTRACTOR SHALL BE RESPONSIBLE TO VERIFY BOTH THE OWNERSHIP AND CONNECTIVITY OF EACH 1-1/4" CONDUIT BETWEEN THE PROPOSED PULLOUT BOXES PRIOR TO PULLING THE NEW CONDUIT INTO EACH PROPOSED PULLOUT BOX. **THE CITY'S PROJECT MANAGER WILL OBSERVE AND VERIFY THE CONTRACTOR'S FINDINGS REGARDING THE OWNERSHIP AND CONNECTIVITY OF THE CITY'S CONDUITS BEFORE ISSUING ANY PAYMENT.**

2) AT EACH PULLOUT LOCATION, TWO PULLOUTS SHALL BE MADE: ONE FOR QUAD "A" AND THE OTHER FOR QUAD "B." THE PULLOUT BOXES SHALL BE LAID OUT NEXT TO EACH OTHER IN ADJACENT CONCRETE SIDEWALK SECTIONS. THIS DETAIL SHALL BE REFFERRED TO FOR PULLING OUT BOTH QUAD "A" AND QUAD "B."

TYPICAL PULLOUT CROSS SECTION [B]
N.T.S.

NOTES:

① FOR CONCRETE PIPE "W" SHALL NOT EXCEED 36" OR 24" GREATER THAN DIAMETER OF THE PIPE, WHICHEVER IS GREATER.
② "D" IS THE OUTSIDE DIAMETER OF THE PIPE.
③ "d" = 3" FOR PIPE 27" DIAMETER & SMALLER, 4" FOR SIZES 30"-60", "d" SHALL BE A MINIMUM OF 4" WHERE POOR OR HARD FOUNDATION CONDITIONS EXIST.
④ DETAILS 1 & 3 CONSIST OF CLASS C BEDDING FOR CONCRETE PIPE.
⑤ "e" SHALL BE A MINIMUM OF 3" WITH GOOD FOUNDATION CONDITIONS, 4" OR DEEPER WHERE POOR OR HARD FOUNDATION CONDITIONS EXIST.
⑥ SEE DETAIL S-1 FOR INFORMATION ABOUT BACKFILL
⑦ SAME MATERIALS AS ZONE 3 INITIAL BACKFILL COMPACTED BY PNEUMATIC TAMPERS TO A MIN. DENSITY OF 90% OF STANDARD PROCTOR MAX DENSITY (AASHTO T-99.) LIFTS SHALL NOT EXCEED 6" IN THICKNESS.
⑧ PLASTIC, POLYETHYLENE, CORRUGATED STEEL, LARGE DIAMETER WRAPPED STEEL PIPE, VITRIFIED CLAY OR OTHER TYPES NOT LISTED.

| PIPE ZONE | PIPE | DETAIL # | INITIAL BACKFILL | | BEDDING | |
|---|---|---|---|---|---|---|
| | | | MATERIAL | THICKNESS | MATERIAL | THICKNESS |
| 1 BACK | DUCTILE IRON WRAPPED STEEL | 1 | -2" GRANULAR | 6" MIN | - | - |
| 2 BED | | 1 | - | 4" | CONSOLIDATED -2" | 3" MIN |
| 3 BACK | CONCRETE ≥ 24" | 2 | -2" | 6" MIN | - | - |
| 4 BED | CONCRETE < 24" | 3 | -3" | 6" MIN | -2" SEE NOTE #7 | O.D./6 + d |
| 5 BED | DELICATE PIPE | 5 | - | - | -1" GRANULAR COMPACT SAME AS ZONE 4 | 2/3O.D. + e |
| 6 BACK | | 5 | -1" GRANULAR | 12" MIN 6" LIFTS | - | - |
| 7 BACK / 7 BED | STEEL PIPE & PVC LINES < 3" NOT IN ROADWAY | 4 | SAND | 4" MIN | SAND | 3" MIN |

PIPE ZONES [C]
N.T.S.

LICENSED PROFESSIONAL ENGINEER CHRISTOPHER ROBERT TSCHIRKI No. 366401 STATE OF UTAH

BACKFILL IN ROADWAYS OR PARKING AREAS

BACKFILL FOR OUTSIDE OF ROADWAYS OR PARKING AREAS

| ZONE | | BACK FILL MATERIAL | | | | |
|---|---|---|---|---|---|---|
| | | TYPE | GRADATION | COMPACTION | LIFT THICKNESS | TEST |
| A | ROADWAY | ROADBASE | -2" | 95% | MIN 12" | AASHTO T-180 |
| B | LOAD | BACKFILL | -6" | 95% | NOT SPECIFIED | AASHTO T-180 |
| C | NON-LOAD | REUSE SPOILS | -6" | WATER JET | NOT SPECIFIED | |
| D | NON-LOAD | TOP SOIL | -6" | ? | NOT SPECIFIED | |

NOTE:

① CUT ASPHALT TO WIDTH OF TRENCH, CONSTURCT PIPELINE & RESTORE SUB-SURFACE. THEN CUT ASPHALT 6" WIDER THAN THE TRENCH ON EACH SIDE. REMOVE ASPHALT & FINISH RESTORATION.

TRENCH DETAILS [D]
N.T.S.

| DESIGN | CT/KL | MAY 2000 | APPROVAL RECOMM. 5-24-2000 | CITY ENGINEER |
|---|---|---|---|---|
| DRAWN | CT | MAY 2000 | | |
| CHECKED | KL | MAY 2000 | APPROVED 24 May 00 | PUBLIC WORKS DIRECTOR |
| REV | DATE | BY | DESCRIPTION | DATE |

OREM

CITY OF OREM
DEPARTMENT OF PUBLIC WORKS
ENGINEERING DIVISION
955 NORTH 900 WEST
OREM, UTAH 84057

CENTER STREET FIBER OPTIC CONDUIT PULLBOX PROJECT
45-7531-731-462
X:\TRAFFIC\CENTER FIBER\DWG\CENTER FIBER.DWG

DETAIL SHEET #1

SHEET: 6/8



ROADWAY CROSS SECTIONS  E
N.T.S.

SIDEWALK SECTIONS  F
N.T.S.

SECTION A-A
THRU SIDEWALK, CURB & GUTTER

SECTION B-B
THRU DRIVE APPROACH

SIDEWALK W/PLANTER STRIP  G
N.T.S.

CURB AND GUTTER  H
N.T.S.

SECTION A-A
THRU SIDEWALK, CURB & GUTTER

CURB & GUTTER

SECTION B-B
THRU DRIVEWAY & DRIVE APPROACH
WITH PLANTER STRIP

CURB & GUTTER

CURB & GUTTER THRU DRIVE APPROACH

| STREET TYPE | X ASPHALT WIDTH (FT.) | Y ASPHALT DEPTH (IN.) | Z BASE DEPTH (IN.) | SUB BASE DEPTH (IN.) |
|---|---|---|---|---|
| SUB-LOCAL | 28 | 3" | 6" | 6" |
| LOCAL | 31 | 3" MINIMUM | 6" MINIMUM | 6" |
| MINOR COLLECTOR | 44 | 3" MINIMUM | 6" MINIMUM | 6" |
| MAJOR COLLECTOR | 50 | 3" MINIMUM | 6" MINIMUM | 6" |
| ARTERIAL | DESIGNED BY CITY ENGINEER | DESIGNED BY CITY ENGINEER | DESIGNED BY CITY ENGINEER | DESIGNED BY CITY ENGINEER |

NOTES:

① MINIMUM ASPHALT & ROAD BASE THICKNESS MAY BE INCREASED DUE TO SOIL CONDITIONS AND TRAFFIC IMPACT (CONGRESS)

② SIDEWALK WIDTHS MAY BE INCREASED IF WARRANTED BASED ON DEMAND, ON COLLECTORS & MINOR CAPACITY STREETS

③ SIDEWALK MAY BE SEPARATED BY PLANTER STRIPS AND APPROVED BY CITY ENGINEER

LICENSED PROFESSIONAL ENGINEER
CHRISTOPHER ROBERT TSCHIRKI
No. 366401
STATE OF UTAH

LICENSED PROFESSIONAL ENGINEER
CHRISTOPHER ROBERT TSCHIRKI
No. 366401
STATE OF UTAH

APPROVAL RECOMM.

| | |
|---|---|
| DATE | 5-24-20 |
| CITY ENGINEER | |

APPROVED

| | |
|---|---|
| DATE | 7/15/20 |
| PUBLIC WORKS DIRECTOR | |

| MAY 2000 | MAY 2000 | MAY 2000 | MAY 2000 |
|---|---|---|---|
| DATE | | | |

DESCRIPTION

| REV. | DATE | BY |
|---|---|---|

| DESIGN CTRL: | |
| DRAWN: CT | |
| CHECKED: KL | |

OREM

CITY OF OREM
DEPARTMENT OF PUBLIC WORKS
ENGINEERING DIVISION
95 EAST 900 WEST
OREM, UTAH 84057

CENTER STREET FIBER OPTIC CONDUIT PULLBOX PROJECT

46-7531-731-442

X:\TRAFFIC\CENTER FIBER.DWG\CENTER FIBER.DWG

DETAIL SHEET #2

SHEET: 7/8

NOTES:

1. INSERTS TO BE CENTERED ON ONE WALL OF TYPE 4 & 5 BOXES 5.625 FROM THE TOP OF EACH BOX

2. TWO PIECES OF ALUMINUM OR STEEL CHANNEL 11" LONG PIERCED CHANNEL, UNISTRUT NO. P1000-H3 OR EQUAL, (41.3 x 41.3 m) SUPPLIED WITH EACH BOX TYPE 4 AND TYPE 5 BOXES.

3. BOLTS TO BE?-13 X?" ?LONG STEEL

4. CHANNEL RACKING TO BE INSTALLED PRIOR TO DELIVERY OF PULL BOX ASSEMBLY

**CHANNEL RACKING DETAILS**

TYPE 4, 16.00"
TYPE 5, 24.75"

7.5"

BOLT PATTERN FOR
4.?"-13 FEMALE
THREADED INSERTS

37.63"
18.00"
5.625"

SEE CHANNEL RACKING DETAILS

6.0"
18.00"
COARSE GRAVEL

24" X 36" "PG" STYLE
TYPE F1

TYPE F1 COMMBOX ASSEMBLY
1-COVER
1-OPEN BOTTOMED BOX
1-CLOSED BOTTOMED BOX W/ WIRE MESH COVERED 2" DRAIN HOLE

NOTES FOR BOXES:

1) TYPE F1 COMMBOX ASSEMBLY SHALL BE DEFINED TO INCLUDE (1) NON-LOAD BEARING COVER, (1) 24" X 36" X 18" DEEP OPEN BOTTOMED BOX AND (1) 24" X 36" X 18" CLOSED BOTTOM BOX. THE ASSEMBLY SHALL FIT TOGETHER SO THAT THE COVER FITS ON TOP OF THE OPEN BOTTOMED BOX, AND THE OPEN BOTTOMED BOX IS STACKED ON TOP OF THE CLOSED BOTTOM BOX. THE BOTTOM OF THE CLOSED BOTTOMED BOX SHALL HAVE A 2" DIAMETER HOLE IN THE CENTER OF THE BOX AND SHALL BE OF SUFFICIENT PITCH TO ALLOW THE BOX TO DRAIN QUICKLY AND THOROUGHLY. THE 2" DIAMETER HOLE SHALL BE FITTED WITH A WIRE MESH THAT SHALL ALLOW THE DRAINING OF WATER WHILE PREVENTING THE ENTRY OF RODENTS AND OTHER ANIMALS.

2) ALL CONDUIT HOLES TO BE CUT BY CONTRACTOR.

3) AN AGGREGATE BASE OF COARSE GRAVEL EXTENDING 18" BELOW THE BOTTOM AND 6" OUT FROM EACH SIDE OF PULL BOX ASSEMBLY REQUIRED WITH INSTALLATION

STANDARD COVER

SERVICE LOAD. 8000 OVER A 10" SQUARE

DESIGN IS FOR SIDEWALK APPLICATIONS WITH A SAFETY FACTOR FOR OCCASIONAL NON-DELIBERATE VEHICULAR TRAFFIC

UNDERGROUND ENCLOSURES SHALL BE COMPOSOLITE AS MANUFACTURED BY QUASITE CORP. OR APPROVED EQUAL. ENCLOSURES AND COVERS SHALL BE CONCRETE GRAY IN COLOR AND RATED NO LESS THAN 8,000 LBS. OVER A 10" X 10" AREA AND BE DESIGNED AND TESTED TO TEMPERATURES OF −50° F. MATERIAL COMPRESSIVE STRENGTH SHOULD BE NO LESS THAN 11,000 PSI. COVERS SHALL HAVE A MINIMUM COEFFICIANT OF FRICTION OF .5. BOXES SHALL BE STACKABLE FOR EXTRA DEPTH.

36" X 48" "PG" STYLE
TYPE F2

TYPE F2 FULL BOX ASSEMBLY
1-COVER
1-OPEN BOTTOMED BOX
1-CLOSED BOTTOMED BOX W/ WIRE MESH COVERED 2" DRAIN HOLE

NOTES FOR BOXES:

1) TYPE F2 PULLBOX ASSEMBLY SHALL BE DEFINED TO INCLUDE (1) NON-LOAD BEARING COVER, (1) 24" X 36" X 18" DEEP OPEN BOTTOMED BOX AND (1) 24" X 36" X 18" CLOSED BOTTOM BOX. THE ASSEMBLY SHALL FIT TOGETHER SO THAT THE COVER FITS ON TOP OF THE OPEN BOTTOMED BOX, AND THE OPEN BOTTOMED BOX IS STACKED ON TOP OF THE CLOSED BOTTOM BOX. THE BOTTOM OF THE CLOSED BOTTOMED BOX SHALL HAVE A 2" DIAMETER HOLE IN THE CENTER OF THE BOX AND SHALL BE OF SUFFICIENT PITCH TO ALLOW THE BOX TO DRAIN QUICKLY AND THOROUGHLY. THE 2" DIAMETER HOLE SHALL BE FITTED WITH A WIRE MESH THAT SHALL ALLOW THE DRAINING OF WATER WHILE PREVENTING THE ENTRY OF RODENTS AND OTHER ANIMALS. EACH BOX IN THIS ASSEMBLY SHALL HAVE CHANNEL RACKING INSTALLED AS SHOWN ON DETAIL DRAWING NUMBER B194-BOX PRIOR TO DELIVERY TO THE CONTRACTOR.

2) ALL CONDUIT HOLES TO BE CUT BY CONTRACTOR.

3) AN AGGREGATE BASE OF COARSE GRAVEL EXTENDING 18" BELOW THE BOTTOM AND 6" OUT FROM EACH SIDE OF PULL BOX ASSEMBLY REQUIRED WITH INSTALLATION

STANDARD COVER

SERVICE LOAD. 8000 OVER A 10" SQUARE

DESIGN IS FOR SIDEWALK APPLICATIONS WITH A SAFETY FACTOR FOR OCCASIONAL NON-DELIBERATE VEHICULAR TRAFFIC

UNDERGROUND ENCLOSURES SHALL BE COMPOSOLITE AS MANUFACTURED BY QUASITE CORP. OR APPROVED EQUAL. ENCLOSURES AND COVERS SHALL BE CONCRETE GRAY IN COLOR AND RATED NO LESS THAN 8,000 LBS. OVER A 10" X 10" AREA AND BE DESIGNED AND TESTED TO TEMPERATURES OF −50° F. MATERIAL COMPRESSIVE STRENGTH SHOULD BE NO LESS THAN 11,000 PSI. COVERS SHALL HAVE A MINIMUM COEFFICIANT OF FRICTION OF .5. BOXES SHALL BE STACKABLE FOR EXTRA DEPTH.

F1 / F2 COMMBOX DETAIL
N.T.S.

?"-16 HEX BOLTS W/ WASHERS (2)
SKID RESISTANT SURFACE
FIBER OPTIC
PULL SLOTS (2)

CENTER STREET FIBER OPTIC CONDUIT PULLBOX PROJECT

40-7831-731-462

X:\TRAFFIC\CENTER FIBER.DWG\CENTER FIBER.DWG

**CITY OF OREM**

DEPARTMENT OF PUBLIC WORKS
ENGINEERING DIVISION
955 NORTH 990 WEST
OREM, UTAH 84057

**DETAIL SHEET #3**

SHEET: 8/8

APPROVAL RECOMM.
DATE 5-24-2010
CITY ENGINEER

APPROVED
DATE 2/14/08
PUBLIC WORKS DIRECTOR

MXT 3000
MXT 3000
MXT 3000
DESCRIPTION

DESIGN /CTRL
DRAWN /CT
CHECKED /CT

REV / DATE / BY

LICENSED PROFESSIONAL ENGINEER
CHRISTOPHER ROBERT TSCHIRKI
No. 366401
STATE OF UTAH

# EXHIBIT B

AGREEMENT

This Agreement is entered into by and between the City of Orem, Utah (hereinafter referred to as the "City"), a municipal corporation and political subdivision of the State of Utah with its principal offices located at 56 North State Street, Orem, Utah 84057 and Brooks Fiber Communications of Utah, Inc. (hereinafter referred to as "Brooks"), a Delaware Corporation with its principal offices at #1 Brooks Center Parkway, Town & Country, Missouri 63017.

RECITALS

WHEREAS, the City has previously installed numerous lengths of conduit under certain City streets; and

WHEREAS, Brooks desires to purchase certain lengths of conduit from the City for the installation of fiber lines for use in Brooks' telecommunications network; and

WHEREAS, the parties desire to set forth their respective rights and obligations in this Agreement.

COVENANTS

Now, therefore in consideration of the mutual promises and conditions set forth herein, and for other good and valuable consideration, the City and Brooks hereby agree as follows:

1. **Sale of Conduit**. The City agrees to sell to Brooks, conduit owned by the City and more specifically described as follows:
    1.1. Two lengths of conduit from the northeast corner of the intersection of 800 East and University Parkway to the southeast corner of the same intersection. The parties estimate that this section of conduit has a length of approximately 181 feet.
    1.2. Two lengths of conduit from the southeast corner of the intersection of 800 East and University Parkway to the southeast corner of the intersection of University Parkway and State Street. The parties estimate that this section of conduit has a length of approximately 2,247 feet.

2. **Consideration**. Brooks shall pay the City for the conduit on a price per foot basis for the number of lineal feet of conduit that Brooks occupies.
    2.1. The price per foot to be paid by Brooks shall be as follows:
        2.1.1. For the conduit described in 1.2., Brooks shall pay the City $10.00 per lineal foot.
        2.1.2. For the conduit described in 1.3., Brooks shall pay the City $7.00 per lineal foot.

    2.2. Brooks shall make an initial payment of Thirty-Five Thousand Dollars ($35,000.00) to the City within thirty (30) days of the execution of this Agreement. This payment shall be made to the City prior to the installation of any Brooks facilities in the conduit. The balance of

ORIGINAL DOCUMENT
City of Orem Recorder's Office

the cost of the conduit shall be paid to the City by Brooks within thirty (30) days of the completion of the installation of Brooks' facilities in the conduit. The exact number of lineal feet of conduit to be purchased by Brooks shall be finally determined after the installation of Brooks' facilities in the conduit. However, the parties currently estimate that the total purchase price of the conduit will be Thirty-Five Thousand Seventy-Eight Dollars ($35,078.00) based upon the following calculations:

| | |
|---|---|
| 362 lineal feet @ $10.00 per foot | $ 3,620.00 |
| 4,494 lineal feet @ $7.00 per foot | $31,458.00 |
| TOTAL | $35,078.00 |

3. **Installation of Appurtenant Facilities.** Brooks acknowledges that there are no pull boxes installed at any of the conduit locations and that an ell connection must be made on the southeast corner of 800 East and University Parkway. Brooks agrees to be solely responsible for the installation and maintenance of all pull boxes and the ell connection and any other appurtenant facilities and equipment necessary for the installation of Brooks' facilities in the conduit. Brooks shall provide the City with as-built drawings of each location where the conduit is exposed. These drawings shall include diagrams of all the conduits in the system, identified by color and location, and if possible, shall also show which conduits are now in use. After Brooks has provided the City with acceptable as-built drawings as described in this section, the City shall provide Brooks with a recordable document which confirms Brooks' ownership of the conduit which Brooks is purchasing from the City pursuant to this Agreement, the location of which will be indicated in the as-built drawings.

4. **Franchise Fee.** The parties acknowledge that they previously executed a Franchise Agreement which was executed by Brooks on September 4, 1997. This Agreement shall not modify the Franchise Agreement in any way. The parties hereby ratify and confirm all of the provisions of said Franchise Agreement. Brooks shall pay the franchise fee set forth in the Franchise Agreement with respect to the new lines Brooks will install in the conduit described in this Agreement.

5. **Use.** The conduit shall be used only for the purpose of the operation of a telecommunications network.

6. **Compliance with Applicable Law.** Brooks shall comply with all federal, state and local laws and regulations with regard to the construction and use of its facilities in the conduit, including applicable zoning, building code and FCC requirements. Brooks shall obtain at its own expense all licenses, permits and authorizations required for the installation and use of its facilities in the conduit including any required permits to work in the rights of way from the Utah Department of Transportation and the City of Orem Department of Public Works. This Agreement does not constitute approval of any required permit for the installation or operation of the Brooks facilities in the conduit.

7. **Non-interference.** Brooks recognizes that there are numerous other lengths of conduit in the same locations and in proximity to the conduit that Brooks is purchasing. These other lengths of

UVU P. 00061

conduit are now or will in the future be occupied and used by other users. Brooks recognizes that there may also be other public utilities located in proximity to the conduit Brooks is purchasing. In no event shall Brooks' installation, use or occupancy of the conduit limit or disrupt the use of such other lengths of conduit or utilities by the City or any other party. Brooks shall take any steps necessary to ensure that the installation of its facilities and its use of the conduit does not interfere with any other utilities or facilities. Brooks agrees to promptly remedy any such disruption or interference at its own expense.

8. **Property Indemnification**. Brooks shall indemnify the City against any and all loss or damage to the City's property, except ordinary wear and tear, caused by Brooks or its employees, agents, or contractors. Pursuant hereto, Brooks shall reimburse the City for any such damage caused. Possible damage includes but is not limited to: streets, rights of way, sidewalks, curb and gutter, utilities, and other lengths of conduit.

9. **General Indemnification**. Brooks shall indemnify and hold harmless the City, its officers, officials, employees, agents and volunteers from all claims, damages, losses and expenses (including attorney's fees) arising out of or resulting from Brooks' activities under this Agreement.

10. **Assignment**. Except as otherwise provided in this Agreement, Brooks may not assign, sublet, license or otherwise transfer, all or any part of its interest in this Agreement or in the conduit without the prior written consent of the City, which consent shall not be unreasonably withheld. Brooks may assign, sublet or license its interest in the conduit to the holder of a valid City of Orem telecommunications franchise. Brooks may also assign its interest in the conduit to its parent company, any subsidiary or affiliate or to any successor-in-interest or entity acquiring fifty-one percent (51%) or more of its stock or assets. Notwithstanding anything to the contrary contained in this Agreement, Brooks may assign, mortgage, pledge, hypothecate or otherwise transfer without consent its interest in the Agreement to any financing entity, or agent on behalf of any financing entity to whom Brooks (i) has obligations for borrowed money or in respect of guaranties thereof, (ii) has obligations evidenced by bonds, debentures, notes or similar instruments, or (iii) has obligations under or with respect to letters of credit, bankers, acceptances and similar facilities or in respect of guaranties thereof.

11. **Taxes**. Brooks shall be responsible for payment of all property taxes assessed upon the conduit or any other equipment or facilities owned by Brooks. The City's real property is normally exempt from property taxes.

12. **General Provisions**.

    12.1. **Lawful Agreement.** The parties represent that they have lawfully entered into this Agreement, having complied with all relevant statutes, ordinances, resolutions, by-laws and other legal requirements applicable to their operation.

    12.2. **Utah Law.** This Agreement shall be interpreted pursuant to Utah law.

    12.3. **Time of Essence.** Time shall be of the essence of this Agreement.

UVU P. 00062

12.4. **Attorney's Fees.** If any party retains, uses or consults an attorney because of the default, breach or failure to perform of any other party to the Agreement, then the non-breaching or non-defaulting party shall be entitled to a reasonable attorney's fee.

12.5. **Interpretation of Agreement.** The invalidity of any portion of this Agreement shall not prevent the remainder from being carried into effect. Whenever the context of any provision shall require it, the singular number shall be held to include the plural number, and vice versa, and the use of any gender shall include any other and all genders. The paragraphs and section headings in this Agreement are for convenience only and do not constitute a part of the provisions hereof.

12.6. **No Presumption.** All parties have participated in preparing this Agreement. Therefore, the parties stipulate that any Court interpreting or construing the Agreement shall not apply the rule of construction that the Agreement should be more strictly construed against the drafting party.

12.7. **Amendments.** This Agreement may be modified or amended by written Agreement only. No oral modifications or amendments shall be effective.

12.8. **Binding Agreement.** This Agreement shall be binding on the heirs, successors, administrators and assigns of each of the parties.

12.9. **Complete Agreement.** This Agreement, including Exhibits, represents a complete and final Agreement of the parties. This Agreement was entered into at arms length, and the terms hereof represent the will of the parties. Therefore, no usage of trade, course of dealing, course of performance, or longstanding practices, policies, or procedures of any of the parties, or their agents, may be inferred as part of this Agreement, may be incorporated in any way as part of this Agreement, nor may constitute a waiver of rights by any of the parties hereto.

13. **Relocation.** The City shall have the right to require the relocation of any or all of Brooks' facilities described in this Agreement to a suitable alternate location in the event that the City determines that in the furtherance of its needs or requirements, such relocation is necessary or desirable.

SIGNED and ENTERED INTO this _____20_____ day of _____August_____, 1998.

CITY OF OREM, by

_____
Jim Reams, City Manager

ATTEST:

_____
Melody Downey, City Recorder

Legal Department
APPROVED AS TO FORM
_____
Jodi J. Caro, Esq.

BROOKS FIBER COMMUNICATIONS OF UTAH, INC.,
A DELAWARE CORPORATION, BY:

_____
(Signed)

_____Lynn Refer, VP Network Development_____
(Print name and Title here)

STATE OF _Illinois_____ )
                                      :ss
COUNTY OF _DuPage_____ )

The foregoing instrument was acknowledged before me this _____14_____ day of _____May_____,
1998, by _____Lynn Refer, an authorized agent of Brooks Fiber Communications_ of Utah, Inc.

_____
NOTARY PUBLIC

(Seal)
My commission expires: _3/16/02_____
Residing at: _271 Acorn Dr. Streamwood Il 60107_

OFFICIAL SEAL
KIMBERLY FIVELSON
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES 3-16-2002

UVU P. 00064

*Conduit*

*Center Street*

A-98-0165

## AGREEMENT

This Agreement is entered into by and between the City of Orem, Utah (hereinafter referred to as the "City"), a municipal corporation and political subdivision of the State of Utah with its principal offices located at 56 North State Street, Orem, Utah 84057 and Brooks Fiber Communications of Utah, Inc. (hereinafter referred to as "Brooks"), a Delaware Corporation with its principal offices at #1 Brooks Center Parkway, Town & Country, Missouri 63017.

## RECITALS

WHEREAS, the City has previously installed numerous lengths of conduit under certain City streets; and

WHEREAS, Brooks desires to purchase certain lengths of conduit from the City for the installation of fiber lines for use in Brooks' telecommunications network; and

WHEREAS, the parties desire to set forth their respective rights and obligations in this Agreement.

## COVENANTS

Now, therefore in consideration of the mutual promises and conditions set forth herein, and for other good and valuable consideration, the City and Brooks hereby agree as follows:

1. **Sale of Conduit**. The City agrees to sell to Brooks, conduit owned by the City and more specifically described as follows:
    1.1. Two lengths of conduit on Center Street from 800 East to Center Street. The parties estimate that this section of conduit has a length of approximately 5,154 feet.

2. **Consideration**. Brooks shall pay the City for the conduit on a price per foot basis for the number of lineal feet of conduit that Brooks occupies.
    2.1. The price per foot to be paid by Brooks shall be as follows:
        2.1.1. For the conduit described in 1.1. Brooks shall pay the City $6.00 per lineal foot.

    2.2. Brooks shall make an initial payment of Sixty Thousand Dollars ($60,000.00) to the City within thirty (30) days of the execution of this Agreement. This payment shall be made to the City prior to the installation of any Brooks facilities in the conduit. The balance of the cost of the conduit shall be paid to the City by Brooks within thirty (30) days of the completion of the installation of Brooks' facilities in the conduit. The exact number of lineal feet of conduit to be purchased by Brooks shall be finally determined after the installation of Brooks' facilities in the conduit. However, the parties currently estimate that the total purchase price of the conduit will be Sixty-One Thousand Eight Hundred Forty-Eight Dollars ($61,848.00) based upon the following calculations:

ORIGINAL DOCUMENT
City of Orem Recorder's Office

| | |
|---|---|
| 10,308 lineal feet @ $6.00 per foot | $61,848.00 |
| TOTAL | $61,848.00 |

3. **Installation of Appurtenant Facilities.** Brooks acknowledges that there are no pull boxes installed at any of the conduit locations and that an ell connection must be made on the southeast corner of 800 East and University Parkway. Brooks agrees to be solely responsible for the installation and maintenance of all pull boxes and the ell connection and any other appurtenant facilities and equipment necessary for the installation of Brooks' facilities in the conduit. Brooks shall provide the City with as-built drawings of each location where the conduit is exposed. These drawings shall include diagrams of all the conduits in the system, identified by color and location, and if possible, shall also show which conduits are now in use. After Brooks has provided the City with acceptable as-built drawings as described in this section, the City shall provide Brooks with a recordable document which confirms Brooks' ownership of the conduit which Brooks is purchasing from the City pursuant to this Agreement, the location of which will be indicated in the as-built drawings.

4. **Franchise Fee.** The parties acknowledge that they previously executed a Franchise Agreement which was executed by Brooks on September 4, 1997. This Agreement shall not modify the Franchise Agreement in any way. The parties hereby ratify and confirm all of the provisions of said Franchise Agreement. Brooks shall pay the franchise fee set forth in the Franchise Agreement with respect to the new lines Brooks will install in the conduit described in this Agreement.

5. **Use.** The conduit shall be used only for the purpose of the operation of a telecommunications network.

6. **Compliance with Applicable Law.** Brooks shall comply with all federal, state and local laws and regulations with regard to the construction and use of its facilities in the conduit, including applicable zoning, building code and FCC requirements. Brooks shall obtain at its own expense all licenses, permits and authorizations required for the installation and use of its facilities in the conduit including any required permits to work in the rights of way from the Utah Department of Transportation and the City of Orem Department of Public Works. This Agreement does not constitute approval of any required permit for the installation or operation of the Brooks facilities in the conduit.

7. **Non-interference.** Brooks recognizes that there are numerous other lengths of conduit in the same locations and in proximity to the conduit that Brooks is purchasing. These other lengths of conduit are now or will in the future be occupied and used by other users. Brooks recognizes that there may also be other public utilities located in proximity to the conduit Brooks is purchasing. In no event shall Brooks' installation, use or occupancy of the conduit limit or disrupt the use of such other lengths of conduit or utilities by the City or any other party. Brooks shall take any steps necessary to ensure that the installation of its facilities and its use of the conduit does not interfere with any other utilities or facilities. Brooks agrees to promptly remedy any such disruption or interference at its own expense.

8. **Property Indemnification**. Brooks shall indemnify the City against any and all loss or damage to the City's property, except ordinary wear and tear, caused by Brooks or its employees, agents, or contractors. Pursuant hereto, Brooks shall reimburse the City for any such damage caused. Possible damage includes but is not limited to: streets, rights of way, sidewalks, curb and gutter, utilities, and other lengths of conduit.

9. **General Indemnification**. Brooks shall indemnify and hold harmless the City, its officers, officials, employees, agents and volunteers from all claims, damages, losses and expenses (including attorney's fees) arising out of or resulting from Brooks' activities under this Agreement.

10. **Assignment**. Except as otherwise provided in this Agreement, Brooks may not assign, sublet, license or otherwise transfer, all or any part of its interest in this Agreement or in the conduit without the prior written consent of the City, which consent shall not be unreasonably withheld. Brooks may assign, sublet or license its interest in the conduit to the holder of a valid City of Orem telecommunications franchise. Brooks may also assign its interest in the conduit to its parent company, any subsidiary or affiliate or to any successor-in-interest or entity acquiring fifty-one percent (51%) or more of its stock or assets. Notwithstanding anything to the contrary contained in this Agreement, Brooks may assign, mortgage, pledge, hypothecate or otherwise transfer without consent its interest in the Agreement to any financing entity, or agent on behalf of any financing entity to whom Brooks (i) has obligations for borrowed money or in respect of guaranties thereof, (ii) has obligations evidenced by bonds, debentures, notes or similar instruments, or (iii) has obligations under or with respect to letters of credit, bankers, acceptances and similar facilities or in respect of guaranties thereof.

11. **Taxes**. Brooks shall be responsible for payment of all property taxes assessed upon the conduit or any other equipment or facilities owned by Brooks. The City's real property is normally exempt from property taxes.

12. **General Provisions**.

   12.1. **Lawful Agreement.** The parties represent that they have lawfully entered into this Agreement, having complied with all relevant statutes, ordinances, resolutions, by-laws and other legal requirements applicable to their operation.

   12.2. **Utah Law.** This Agreement shall be interpreted pursuant to Utah law.

   12.3. **Time of Essence.** Time shall be of the essence of this Agreement.

   12.4. **Attorney's Fees.** If any party retains, uses or consults an attorney because of the default, breach or failure to perform of any other party to the Agreement, then the non-breaching or non-defaulting party shall be entitled to a reasonable attorney's fee.

   12.5. **Interpretation of Agreement.** The invalidity of any portion of this Agreement shall not prevent the remainder from being carried into effect. Whenever the context of

any provision shall require it, the singular number shall be held to include the plural number, and vice versa, and the use of any gender shall include any other and all genders. The paragraphs and section headings in this Agreement are for convenience only and do not constitute a part of the provisions hereof.

12.6. **No Presumption.** All parties have participated in preparing this Agreement. Therefore, the parties stipulate that any Court interpreting or construing the Agreement shall not apply the rule of construction that the Agreement should be more strictly construed against the drafting party.

12.7. **Amendments.** This Agreement may be modified or amended by written Agreement only. No oral modifications or amendments shall be effective.

12.8. **Binding Agreement.** This Agreement shall be binding on the heirs, successors, administrators and assigns of each of the parties.

12.9. **Complete Agreement.** This Agreement, including Exhibits, represents a complete and final Agreement of the parties. This Agreement was entered into at arms length, and the terms hereof represent the will of the parties. Therefore, no usage of trade, course of dealing, course of performance, or longstanding practices, policies, or procedures of any of the parties, or their agents, may be inferred as part of this Agreement, may be incorporated in any way as part of this Agreement, nor may constitute a waiver of rights by any of the parties hereto.

13. **Relocation.** The City shall have the right to require the relocation of any or all of Brooks' facilities described in this Agreement to a suitable alternate location in the event that the City determines that in the furtherance of its needs or requirements, such relocation is necessary or desirable.

UVU P. 00068

SIGNED and ENTERED INTO this _20_ day of _August_, 1998.

CITY OF OREM, by

_____
Jim Reams, City Manager

ATTEST:

_____
Melody Downey, City Recorder


BROOKS FIBER COMMUNICATIONS OF UTAH, INC.,
A DELAWARE CORPORATION, BY:

_____
(Signed)

> Legal Department
> APPROVED AS TO FORM
> _____ 5/13/98
> Jodi J. Caro, Esq.

_Lynn Refer, VP Network Development_
(Print name and Title here)


STATE OF _Illinois_     )
                             :ss
COUNTY OF _DuPage_     )

The foregoing instrument was acknowledged before me this _14_ day of _May_,
1998, by _Lynn Refer, an authorized agent of Brooks Fiber Communications_ of Utah, Inc.

_____
NOTARY PUBLIC

(Seal)
My commission expires: _3/16/02_
Residing at: _271 Acorn Dr. Streamwood IL 60107_

> OFFICIAL SEAL
> KIMBERLY FIVELSON
> NOTARY PUBLIC, STATE OF ILLINOIS
> MY COMMISSION EXPIRES 3-16-2002

UVU P. 00069

# EXHIBIT C

## BILL OF SALE

City of Orem, Utah, located at 56 North State Street, Orem Utah 84057 ("Seller") for and in consideration of One Hundred Thirty Two Thousand Two Hundred Thirty Dollars ($132,230.00) and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, has bargained and sold, and does by this document, grant, bargain, sell, convey, transfer, assign and set over unto **TCG Utah**, a New York general partnership located at One AT&T Way, Bedminster New Jersey ("Buyer"), its successors and assigns, all right, title and interest in One 1.25" conduit more specifically identified on **Schedule 1**, attached hereto and incorporated herein by reference. Seller shall designate the specific 1.25" conduit sold to Buyer in each run shown on **Schedule 1**. Buyer's purchase of the conduit includes the non-exclusive right to use associated manhole structures serving the conduit in the designated runs. The conduit purchased by Buyer and the associated manhole structures shall be referred to as the "Facilities".

1.      Except for the covenants, representations, and warranties specifically set forth in this Bill of Sale, Seller makes no covenants, representations, and/or warranties to Buyer or any other person or entity, whether express, implied or statutory, as to the construction, installation, description, quality, merchantability, completeness or fitness for any particular purpose of the Facilities or as to any other matter, all of which covenants, representations, and/or warranties are hereby expressly excluded and disclaimed.

2.      Seller hereby warrants to Buyer that immediately prior to the delivery of this Bill of Sale: (a) Seller has full right, power and authority to sell and transfer the Facilities as herein provided; (b) The Facilities have been installed in a good and workmanlike manner and in accordance with City of Orem requirements, the National Electrical Code, industry standards and all applicable laws and regulations; (c) The Facilities are free and clear of any security interests or other liens, encumbrances, claims or rights of others of any kind whatsoever; (d) Seller has obtained any and all governmental or municipal approval, franchise and authorization, right-of-way agreement, conduit agreement and lease, license, consent or other agreement or authorization relating to the construction of the Facilities; and (e) There are no proceedings, actions, litigation, bankruptcy petitions, judgments or claims of any nature whatsoever, against Seller that relate to the Facilities on Seller's right to transfer same, pending or threatening, before any government, regulatory authority or any administrative forum.

3.      The parties shall complete any forms and make such tax filings pertaining to the transaction contemplated by this Bill of Sale as may be required by any federal, state, county, city or other applicable law, rule or ordinance.

4.      Seller shall warrant and defend good and marketable title to the Facilities against any and all claims and demands of all persons and entities whatsoever.

5.      This Bill of Sale may be executed in several counterparts, which shall constitute one and the same instrument.

6.      This Bill of Sale shall be governed by the laws of the State of Utah, without regard to choice of law principles.

7.      Buyer shall have unescorted access to the Facilities on a 24-hour, 365-day per year basis.

8.      Nothing herein relieves Buyer of its obligation to comply with applicable laws and regulations related to excavations and construction in public streets and rights-of-way or with Buyer's obligation to comply with its telecommunications franchise agreement with the City of Orem.

9.      Buyer shall be solely responsible for the costs of any additional vaults, handholes or other structures or equipment it may need to put the conduit to its intended use.

10.      Buyer recognizes that there are other conduits in close proximity to the conduit it is purchasing. Buyer agrees that it will not use or maintain its conduit in a manner that disrupts or interferes with the use of the other conduits.

ORIGINAL DOCUMENT
City of Orem Recorder's Office

**IN WITNESS WHEREOF**, the parties, intending to be bound hereby, have caused this Bill of Sale to be duly executed and delivered as of this 23 day of Mar , 2010.

**SELLER:** _____

By: _____
Name: _____
Title: _____

**ACCEPTED** this _____ day of _____, 2010.

**BUYER: AT&T** _____

By: _____
Name: _____
Title: _____
Approved as to Form - Legal Department - By:_____ Date:_____

ATTEST:

City Recorder

- 2 -

UVU P. 00089
10/13/10

## SCHEDULE 1



Orem UT City owned duct

**Route Description:**

Northern Route (approximately 8,402'):

1. Starting at an existing City-owned handhole in front of 280 S. State St heading in a Northwesterly direction along State St to an existing City-owned handhole located at the NW corner of the intersection of State St and Center St.
2. Starting at an existing City-owned handhole located at the NE corner of the intersection of State St and Center St heading in an Easterly direction along Center St to an existing City-owned handhole located at the NW corner of the intersection of Center St and N 1000 E St.
3. There are existing handholes installed along this route.

Southern Route (Approximately 4,821'):

1. Starting in front of 325 S State Street heading in a Southeasterly direction along S State St to the SE corner of State St and W 400 S St then continuing in an Easterly direction along W 400 S St to the SE corner of the intersection of W 400 S St and S 800 E St.
2. Handholes need to be installed along this route. The City of Orem and TCG are developing a Joint Build Agreement to install handholes and additional conduit that will specify the cost sharing methodology to allocate costs to each party.

- 3 -

10/13/10

# EXHIBIT D

A-2014-0177

**PURCHASE AGREEMENT**
**CENTER STREET FIBER CONDUIT**

This Center Street Fiber Conduit Purchase Agreement (Agreement) made and effective as of this __22nd__ day of __August__, 2014 by and between the City of Orem (City), a Utah municipal corporation located at 56 N. Center Street, Orem, Utah and CenturyLink, a Qwest Corporation DBA CenturyLink corporation, located at 75 East 100 North Provo, Utah 84606 (CenturyLink).

**RECITALS**

**WHEREAS** the City is the owner of certain underground conduit that runs along the north side of Center Street in Orem, Utah; and

**WHEREAS** CenturyLink proposes to purchase 815 feet of the underground conduit for its own use;

**AGREEMENT**

**NOW THEREFORE**, in reliance on the above recitals for and in consideration of the premises, provisions, and covenants as set forth herein and other good and valuable consideration, the receipt and sufficiency of which is acknowledged, the City and CenturyLink hereby agree as follows:

1. <u>Purchase of the Underground Conduit.</u> The City agrees to sell to CenturyLink all right, title, and interest in 815 feet of the underground conduit that runs along the north side of Center Street more particularly described below to CenturyLink at a price of $10.00 per foot for a total purchase price of $8,150.00:
   a. <u>Description of Underground Conduit</u>: The approximate address location of the conduit is on 385 East Center Street, Orem, Utah and 263 East Center Street in Orem, Utah with NAD27 coordinates of Northing 715363.72, Easting 1948247.65 and Northing 715378.28, Easting 1947438.55.
   Payment will be made to the City no later than _____.

2. <u>Warranties.</u> The City hereby warrants to CenturyLink that immediately prior to the execution of this Agreement: (a) the City had full right, power, and authority to sell and transfer the underground conduit to CenturyLink; and (b) the underground conduit is free and clear of any security interest or other liens, encumbrances, claims, or rights of others of any kind.

3. <u>Disclaimer of Warranties.</u> Except as provided herein, the City sells the underground conduit to CenturyLink on an "as is" basis without warranties of any kind. Neither the City nor its employees, officers, contractors, or agents warrant that the use of the conduit system will be uninterrupted, secure, or produce particular results. Furthermore, the City makes no covenants, representations, and/or warranties to CenturyLink or any other person or entity, whether express or implied or statutory, as to the construction, installation, description, quality, merchantability, completeness or fitness for any particular purpose of the underground conduit or as to any other matter, all of which covenants, representations, and/or warranties are hereby expressly excluded and disclaimed.

ORIGINAL DOCUMENT
City of Orem Recorder's Office

UVU P. 00115

4. <u>Compliance With All Applicable Laws and Agreements</u>.  Nothing herein relieves CenturyLink of its obligation to comply with applicable laws and regulations related to excavations and construction in public streets and rights-of-way or with CenturyLink's obligation to comply with any telecommunication franchise agreement with the City.

5. <u>CenturyLink's Conduct</u>.  CenturyLink recognizes that there are other conduits in close proximity to the underground conduit it is purchasing.  CenturyLink agrees that it will not use or maintain its conduit in a manner that disrupts or interferes with the use of the other conduits.

6. <u>Access to the Underground Conduit</u>.  CenturyLink will access the underground conduit through handholds it has installed.  CenturyLink will be responsible for the cost of any additional handholds or other structures or equipment it may need to put the conduit to its intended use.

7. <u>Governing Law</u>.  This Agreement shall be construed in accordance with, and governed in all respects by, the laws of the State of Utah, without giving effect to principles of conflicts of laws.

8. <u>Assignment</u>.  This Agreement shall benefit and be binding upon the parties hereto and their respective successors and assigns.

9. <u>Entire Agreement</u>.  This Agreement sets forth the final, complete, and exclusive agreement of the parties relative to the subject matter hereof and supersedes all prior contemporaneous understandings and agreements relating to its subject matter.

10. <u>Multiple Copies</u>.  Each copy of this Agreement that is signed, by original or facsimile signature, by both parties shall be deemed an original thereof.

THE PARTIES HEREBY ACKNOWLEDGE that this Agreement is executed by them and they agree to become legally bound hereunder.

Representative of CenturyLink
PURCHASER
Date: 8/22/14

Brett Echols
Director Engineering & Construcuon
Centurylink

James P. Davidson, City Manager
CITY OF OREM
Date: 9/4/2014

ATTEST:
City Recorder

UVU P. 00116



Conduit Purchased by CenturyLink

| EXHIBIT<br><br>A | CenturyLink Conduit Purchase | **CITY OF OREM**<br>DEVELOPMENT SERVICES<br>ENGINEERING DIVISION<br>56 NORTH STATE ST<br>OREM, UT 84057 |  |
|---|---|---|---|
| | X:\Misc\Century Link\Exhibit A.dwg | | |

UVU 000117

# EXHIBIT E

A-2017-0169

# CONDUIT OCCUPANCY AGREEMENT

This Conduit Occupancy Agreement (the "Agreement") is made and entered into on ~~August~~ *Sep.* *DEW* *18*, 2017 (the "Effective Date"), between Orem City Corporation, a municipal corporation organized under the laws of the State of Utah, ("Licensor") and **First Digital** ("Licensee") (each a "Party" and collectively, the "Parties").

## WITNESSETH

WHEREAS, Licensor is a municipality owning a system of Conduit, Ducts, Manholes and Handholes in its public rights-of-way; and

WHEREAS, Licensor desires to provide Licensee with the non-exclusive use of space in its Conduit and Duct for the provision of communications services provided to residents and businesses located in Orem, Utah; and

NOW, THEREFORE, in consideration of the mutual covenants and agreements made and contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

## ARTICLE I.   DEFINITIONS

Section 1.01   Definitions

(a) "**Affiliate**" means any entity that now or in the future, directly or indirectly controls, is controlled with or by or is under common control with a Party; and "control" shall mean, with respect to: (a) a U.S. corporation, the ownership, directly or indirectly, of fifty percent (50%) or more of the voting power to elect directors thereof; (b) a non-U.S. corporation, if the voting power to elect directors thereof is less than fifty percent (50%), the maximum amount allowed by applicable law; and (c) any other entity, fifty percent (50%) or more ownership interest in said entity, or the power to direct the management of such entity.

(b) "**Audit**" means a periodic examination of Licensor's Conduit and Duct occupied by Licensee and any of Licensee's Attachments or Equipment attached to such Conduit or Duct for the purpose of (i) verifying the presence or location of all Attachments and other Equipment of Licensee, or (ii) determining whether Licensee is in compliance with the requirements and specifications of this Agreement or any other obligation of Licensee under this Agreement.

(c) "**Conduit**" means a structure containing one or more Ducts, usually placed in the ground, in which cables or wires may be installed.  Unless expressly stated otherwise, Conduit does not include "Electric Conduit," which is Conduit containing Licensor's current bearing Equipment.

(d) "**Conduit System**" means any combination of Ducts, Conduits, Manholes, and Handholes joined to form an integrated whole.  As used in this Agreement, the term refers to Conduit Systems owned or controlled by Licensor.

(e) "**Protected Information**" means all written and verbal proprietary or business confidential

ORIGINAL DOCUMENT
City of Orem Recorder's Office

1

UVU P. 00118

communications between the parties and all plans, documents, materials and data provided by each Party to the other in connection with and related to this Agreement and Licensee's Attachments, or such documents as are exempt from GRAMA, all as properly classified in accordance with GRAMA.

(f)   "**Duct**" means a single enclosed tube, pipe, or channel for enclosing and carrying cables, wires, and other facilities.   As used in this Agreement, the term Duct includes Inner-Ducts created by subdividing a Duct into smaller channels.

(g)   "**Equipment**" means all devices, articles or structures necessary to operate the respective operations or businesses of the Parties, as such businesses may exist as of the Effective Date and as such operations or businesses may evolve, develop, or change at any time while this Agreement remains in effect, including, but not limited to, antennae, cables, wires, conductors, fiber optics, insulators, connectors, fasteners, transformers, capacitors, switches, batteries, amplifiers, transmitters, transceivers, materials, appurtenances, or apparatus of any sort, whether electrical or physical in nature, or otherwise, including without limitation all support equipment such as guy wires, anchors, anchor rods, grounds, and other accessories.

(h)   "**Fee Schedule**" means the fees and charges set forth in Licensor's Conduit Occupancy Fee Schedule, attached hereto as Exhibit A.

(i)   "**GRAMA**" means the Utah Government Records Access Management Act, Title 63G, Chapter 2, Utah Code Annotated, 1953, as amended.

(j)   "**Handholes**" means an enclosure, usually below ground level, used for the purpose of installing, operating, and maintaining Equipment in a Conduit.  A Handhole is too small to permit personnel to physically enter.

(k)   "**Inner-Duct**" means a pathway created by subdividing a Duct into smaller channels.

(l)   "**Licensor's Facilities**" means Licensor's Equipment, Conduit and Duct.

(m)   "**Make Ready Work**" means the changes to be made to Licensor's Ducts, Conduits, Handholes, which changes may be needed to accommodate Licensee's proposed equipment.  Such make-ready work is to be approved by Licensor and performed by Licensee's employees, a certified contractor approved by Licensor but employed by Licensee, or a third party.  Make Ready Work that involves Licensor's Facilities shall be done by Licensee, unless otherwise approved by Licensor.  This definition includes all engineering, inspection, design, planning, construction, or other work reasonably necessary for the installation of Licensee's installation of equipment into Conduit or Ducts, including without limitation, work related to transfers, rearrangements and replacements of existing Equipment, and the addition of new Equipment, and the rearrangement of third party pole attachments.

(n)   "**Manhole**" means an enclosure, usually below ground level and entered through a hole on the surface covered with a cast iron or concrete Manhole cover, which personnel may enter and use for the purpose of installing, operating, and maintaining Equipment in a Conduit.

(o)   "**National Electrical Safety Code**" or "**NESC**" means the current edition, and any supplements thereto and revisions or replacements thereof, of the publication so named, published by the Institute of Electrical and Electronics Engineers, Inc., for the purpose of safeguarding persons and property

UVU P. 00119

during the installation, operation, or maintenance of electric supply and communication lines and associated equipment.

(p)  "**Non-recurring Charges**" means legally authorized and identifiable amounts payable by Licensee under this Agreement other than rental charges.

Section 1.02    Other Interpretative Provisions

(a)    The meanings of defined terms are equally applicable to the singular and plural forms of the defined terms.

(b)    The words "hereof," "herein," "hereunder" and similar words refer to this Agreement as a whole and not to any particular provision of this Agreement; and Section, Article, clause, Schedule, Exhibit and Appendix references are to this Agreement unless otherwise specified.

(c)    The terms "including" and "include" are not limiting and mean "including without limitation" and "include without limitation."

(d)    In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including"; the words "to" and "until" each means "to but excluding," and the word "through" means "to and including."

(e)    Any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, amended and restated, supplemented or otherwise modified.

(f)    Any reference herein to any person or entity shall be construed to include such person or entity's successors and permitted assigns.

(g)    Any reference herein to "year," "month" or "day" shall mean a calendar year, month, or day unless otherwise specified.

## ARTICLE II.    SCOPE OF AGREEMENT

Section 2.01    Conduit and Duct

This Agreement shall cover Licensor's Conduits and Ducts specifically designated in Exhibit "C", which is attached hereto and incorporated herein by reference. This Agreement does not grant Licensee any use or rights with respect to Licensor's Electric Conduit regardless of whether or not the Electric Conduit contains telecommunications fiber.

Section 2.02    Exclusions

This Agreement applies to the use of Licensor's Conduits, and Ducts only.  Licensee's use of electric transmission facilities, other than Conduits, and Ducts, is expressly excluded from this Agreement, and nothing in this Agreement will be construed to authorize Licensee to use any such facilities.

UVU P. 00120

## Section 2.03   Purpose

Licensee's use of Licensor's Conduits, and Ducts shall be confined to the usage that Licensor has granted Licensee written permission to install or as otherwise provided pursuant to the terms and conditions of this Agreement.

## Section 2.04   Restriction

Licensee shall not create, or permit to exist, any lien or encumbrance on the Conduit System.

# ARTICLE III.        LEASE OF CONDUIT AND DUCTS.

## Section 3.01   Use of Conduit System

 Licensor hereby leases space in Licensor's Conduit System to Licensee. The specific Conduits and Ducts leased by Licensor to Licensee are designated on Exhibit "C". This lease is non-exclusive and is for the sole purpose of allowing Licensee to install, maintain and use the designated Conduit and Ducts for the installation, use and maintenance of Licensee's fiber optics.

## Section 3.02   Condition of Conduit System

Licensee will have had an opportunity to inspect Licensor's Conduit System prior to presenting an Exhibit "C" proposed leased conduit section. Licensee agrees to accept the leased Conduit and Ducts in an "as-is" condition; Licensee will have the right to proof the specific Conduit and Ducts presented with each Exhibit "C" prior to accepting the leased Conduit and Ducts.  If there is damaged pathway the Licensee will present costs to fix the pathway as part of the "Make Ready Work."  The annual lease rental may be negotiated between Licensee and Licensor for the presented Exhibit "C" section based on the estimated cost to repair the pathway.  Licensor makes no representations regarding the suitability, quality or condition of the leased Conduits and Ducts and does not warrant the leased Conduits and Ducts in any fashion.

## Section 3.03   Ownership of Conduit System

The Conduit System, including the leased Conduits and Ducts, shall at all times be and remain the property of Licensor. Any improvements or additions to the Conduit System made by Licensee shall become the property of Licensor immediately upon acceptance. Improvements or additions not accepted by Licensor shall be brought into compliance with Licensor's specifications. Fiber optics installed by Licensee in the Conduit and Duct leased by Licensee pursuant to this Agreement shall at all times be and remain the property of Lessee, unless deemed abandoned by Licensee based on Licensee's failure to remove the fiber optics upon termination of this Agreement.

# ARTICLE IV.        MAINTENANCE OF CONDUITS

## Section 4.01   Expense of Maintenance

Licensee shall be solely responsible for collection of costs of damages for Conduits broken or damaged by third-parties.  The expense of maintaining the  Conduit and/or Duct occupied by the Licensee shall be borne exclusively by the Licensee and the Licensee shall maintain the Conduit and/or Duct and any associated junction boxes and/or handholes in a safe and serviceable condition, and shall replace, reinforce, or repair such Conduit and/or Duct and any associated junction boxes and/or handholes as they become defective. The expense of maintaining any Conduit and/or Duct and junction boxes and/or handholes used exclusively by the Licensor shall be borne exclusively by the Licensor.  Licensor and

4

Licensee will work together and coordinate on all maintenance and repair of the leased Conduits, Ducts, junction boxes and/or handholes. Licensee shall be solely responsible for the field locating or "bluestaking" of the Conduit and/or Duct it occupies. Licensee shall be responsible for collection of costs of damages to its own Equipment. Licensee will be responsible to restore landscape and any adjoining property damaged during maintenance. This would include asphalt, concrete, any retaining walls, fencing, etc.

Section 4.02    Licensee's Retained Rights
This Agreement shall be subject to and subordinate to the Licensor's right to maintain, relocate and use the Conduit System, and to use, alter or excavate any portion of the right-of-way or utilities in the right-of-way. Licensee agrees to use commercially reasonable efforts to minimize any adverse on Licensee's rights under this Agreement. In the event Licensor desires to make changes to the Conduit System affecting Licensee, Licensor shall provide Licensee at least sixty (60) days written notice (unless the desired change results from an emergency or unplanned situation, in which case the best practicable notice will be given) setting forth a description of the changes that could reasonably result in a material diminution or reduction of Lessee's rights under this Agreement. Upon receipt of such notice, Licensee shall have the right to terminate the affected portions of this Agreement without further liability.

Section 4.03    Condition
Licensee shall maintain its fiber optics in a functional and safe condition. All installation and maintenance of Licensee's fiber optics, and all maintenance of the leased portion of the Conduit System, shall be performed according to industry standards and in a manner that minimizes any interruption or disruption of the affected rights-of-way, utilities, communications, streets, and traffic control devices and systems. Licensee shall restore all rights-of-way, utilities, communications, streets and traffic control devices and systems to their previous condition. All work performed by Licensee shall be in accordance with Licensee's construction standards and specifications and only after written approval by Licensor of Licensee's plans.

## ARTICLE V.        ACCESS TO CONDUITS AND DUCTS

Section 5.01    Applications
Applications for the placing of Equipment in Licensor's Ducts and Conduits are subject to the following:.

Section 5.02    Access to Conduit and Duct
Licensee's Equipment placed in Licensor's Conduit System must meet all of the following physical design specifications:

(a) Cables bound or wrapped with cloth or having any kind of fibrous coverings or impregnated with an adhesive material shall not be placed in Licensor's Conduit or Ducts.

(b) The integrity of Licensor's Conduit System and overall safety of Licensor's personnel and other personnel working in Licensor's Conduit System requires that "dielectric cable" be placed when Licensee's cable Equipment utilizes an alternative Duct or route that is shared in the same trench by any current carrying Equipment of a power utility.

(c) New construction splices in Licensee's fiber optic cables shall be located in Manholes, pull boxes or Handholes.

(d) Licensee shall have no right to enter, utilize, or request the use of any of Licensor's Electric Conduit.

UVU P. 00122

The following specifications apply to connections of Licensee's Conduit to Licensor's Conduit System:

(e)    Licensee will be permitted to connect its Conduit or Duct at a Licensor Manhole or Handhole. No attachment will be made by entering or breaking into Licensor's Conduit between Manholes or Handholes. Licensee will be permitted to connect to the leased Conduit or Duct between Manhole or Handholes as long as the connected Conduit or Duct is only the leased conduit. Licensee may present plans to install new Handholes or Manholes in behalf of Licensor, as part of its Make Ready Work between two different Licensor Handholes and Manholes. The cost for placing a new Licensor Handhole or Manhole will be the expense and burden of the Licensee. The annual lease rental may be negotiated between Licensee and Licensor based on the estimated cost of work. If approved, Licensee will be permitted to connect its Conduit or Duct to the new Licensor's Handhole or Manhole. All necessary work to install Licensee Equipment will be performed by Licensee or its contractor at Licensee's expense. In no event shall Licensee or its contractor "core bore" or make any other modification to Licensor Manhole(s) without the prior written approval of Licensor.

(f)    If Licensee constructs or utilizes a Duct connected to Licensor's Manhole, the Duct and all connections between that Duct and Licensor's Manhole shall be sealed, to the extent practicable, to prevent the entry of gases or liquids into Licensor's Conduit System. If Licensee's Duct enters a building, it shall also be sealed where it enters the building and at all other locations necessary to prevent the entry of gases and liquids from the building into Licensor's Conduit System.

Section 5.03    Opening of Manholes

The following requirements apply to the opening of Licensor's Manholes and the authority of Licensor personnel present when work on Licensee's behalf is being performed within or in the vicinity of Licensor's Conduit System.

(a)    Licensor's Manholes shall be opened only as permitted by Licensor's authorized employees or agents, including authorized third party contractors.

(b)    Except in the event of an emergency, Licensee shall notify Licensor forty-eight (48) hours in advance of any routine work operation requiring entry into any of Licensor's Manholes.

(c)    Licensee shall be responsible for obtaining any necessary authorization from appropriate authorities to open Manholes for Conduit work operations therein.

Section 5.04    Audits of Existing Equipment in Licensor's Duct and Conduit

Licensor may conduct an Audit of Equipment placed in its Duct and Conduit once every five (5) years. Licensor shall give Licensee at least ninety (90) days prior notice of an initial meeting to plan the next Audit. At such meeting, Licensor, Licensee and all other owners of Equipment in attendance in person or by representative shall participate in, among other things, the selection of an independent contractor for conducting the Audit, as well as the scheduling, scope, extent and reporting of the Audit results. The independent contractor appointed to conduct the Audit must not be reasonably believed by Licensor, Licensee, or any other owner of Equipment to have a conflict of interest with respect to the accurate completion of that Audit. Regardless of whether Licensee attends the Audit planning meeting or expresses an intention to participate in the Audit, Licensor shall notify Licensee at least sixty (60) days prior to the commencement of the Audit. Licensee shall advise Licensor if Licensee desires to participate in the Audit with Licensor not less than thirty (30) days prior to the scheduled date of such Audit. The cost of the Audit shall be apportioned among those owners of Equipment who own Equipment placed in

6

the Conduit and Duct included in the audit in proportion to the feet of Conduit and Duct in which they have placed Equipment. The data from Audit shall be made available to Licensee and all other relevant owners of Equipment and used to update the Parties' records, provided that any information confidential to Licensor or Licensee will not be distributed to other owners. Any Party shall make any objections to the Audit results within ninety (90) days of receipt of the Audit report or such objections are waived.

Section 5.05    Inspections

In addition to Audits as described in 0 above, Licensor shall have the right to inspect Licensee's Equipment placed in Licensor's Conduit or Duct at any time.

Section 5.06    Removal

Licensee has the right to remove Equipment located within Licensor's Conduit by written notice to Licensor. Rental fees shall cease with respect to such Conduit as of the date of removal. In the event that (i) Licensee ceases to use certain Attachments placed in Licensor's Conduit, (ii) Licensee does not reasonably anticipate using such Attachments in the future, and (iii) Licensor needs to use the space occupied by Licensee within Licensor's Conduit, Licensee will remove the relevant Attachments from Licensor's Conduit. In the event that Licensee does not remove the relevant Attachments within thirty (30) days of written notice from Licensor that Licensee is obliged to remove the Attachments pursuant to this Section 5.06, Licensor may remove the relevant Attachments from Conduit in a reasonable manner consistent with industry practices, and Licensee will reimburse Licensor, or Licensor's contractor, for all reasonable and documented costs actually incurred.

## ARTICLE VI.        RENTAL PAYMENTS

Section 6.01    Rental Amount—Conduit and Duct

For authorized Attachments placed in Licensor's Conduit or Duct covered under this Agreement, Licensee shall pay to Licensor, in advance, on an annual basis, a rental amount per linear foot as shown on Exhibit A, on a billing cycle beginning January 1 of each year. The rental amount for each year shall be based on Licensor's tabulation of Licensee's Attachments situated upon Licensor's Conduit and Duct and Licensor's current records.

Section 6.02    Unauthorized Attachments

Licensee shall not make Attachments in Licensor's Conduits without obtaining Licensor's written permission as provided for in this Agreement. In the event Licensee becomes aware of any unauthorized Attachment, Licensee shall make an application to Licensor for such Attachment. Licensee shall pay a late fee for such application in an amount equal to five (5) times the rental fee set forth on Exhibit A. Conduit rental fees shall accrue as of the date of installation, whether Licensee's application is approved or rejected. If Licensor rejects the Licensee's application, Licensee shall remove the unauthorized Attachment within ninety (90) days of Licensor's rejection of the application. If Licensee does not remove the unauthorized Attachment within such ninety (90) days, then Licensor may remove the unauthorized Attachment at Licensee's expense.

Section 6.03    Billing and Payments

Licensor shall send invoices to Licensee via regular U.S. Mail at the address specified below, or at such other address as Licensee may designate from time to time. Invoices for rental charges will be sent annually or semi-annually. Invoices for all Non-Recurring Charges, Make Ready Work fees, and other obligations or amounts due under this Agreement other than rental charges will be sent at Licensor's discretion within a reasonable time, unless otherwise specified in this Agreement. Invoices for Non-

Recurring Charges will provide specific identifying information pertaining to each charge.  Invoices for rental charges will provide summary information only.  Licensee may obtain additional information pertaining to charges upon written request to Licensor.

Except as otherwise provided in this Agreement or agreed to by the Parties, Licensee shall pay all undisputed charges within thirty (30) days from the invoice date.  Interest at the rate set forth in Section 8.03 shall be imposed on any delinquent amounts.  In the event of a billing dispute, Licensee shall submit such dispute in writing within ninety (90) days of the date the bill was due.  Licensor shall have sixty (60) days to resolve the dispute in writing.  Upon resolution of any such billing dispute in Licensee's favor, Licensor will refund any amounts owed.  Upon resolution of any such billing dispute in Licensor's favor, Licensee will pay any amounts owed, with interest accruing at the rate specified in Section 8.03 on any unpaid disputed amounts, dating from the bill due date.
All bills shall be paid to the address designated from time to time in writing by Licensor.

Licensor's Billing Address:

City of Orem
56 N State St
Orem, UT  84663

Licensee's billing address:

FirstDigital Telecom
90 South 400 West Suite M100
Salt Lake City, UT  84101

**With copies to (which shall not constitute notice):**

56 N State St
Orem, UT  84663

fax no.: (801) 456-1010
Email: bbalmforth@firstdigital.com

**With a copy to (which copy will not constitute notice):**


## ARTICLE VII.        BREACH AND REMEDIES

### Section 7.01    Remedies for Default

If either Party shall default in any of its obligations under this Agreement and such default continues thirty (30) days after written notice thereof has been provided to the defaulting Party, the Party not in default may exercise any of the remedies available to it; provided, however, in such cases where a default cannot be cured within the thirty (30) day period by the exercise of diligent, commercially reasonable effort, the defaulting Party shall have an additional sixty (60) days to cure the default for a total of ninety (90) days after the Party not in default provides its notice of default.  Subject to this section the remedies available to each Party shall include, without limitation: (i) refusal to grant any additional permission for Attachments to the other Party until the default is cured; (ii) termination of this Agreement; and (iii) injunctive relief.  In the event that Licensor remedies any breach by Licensee of this Agreement, Licensee shall (a) pay in advance, within thirty (30) days of notice of the breach by Licensor including a cost estimate, Licensor's costs for the remedy specified in the breach notice and (b) pay within thirty (30) days of receipt of an invoice following completion of the work any reasonable and documented costs in addition to the amount already paid.  Licensor will reimburse Licensee in the event that reasonable and documented costs are less than the amount paid by Licensee.

8

UVU P. 00125

## ARTICLE VIII.   GENERAL PROVISIONS

### Section 8.01   Governing Law

This Agreement and any action related to this Agreement will be governed the laws of the State of Utah.

### Section 8.02   Failure to Enforce Rights

The failure of either Party to enforce or insist upon compliance with any of the terms or conditions of this Agreement in any instance shall not constitute a general waiver or relinquishment of any such terms or conditions, but the same shall be and remain, at all times, in full force and effect.

### Section 8.03   Interest

All amounts payable under the provisions of this Agreement shall, unless otherwise specified herein or disputed in good faith, be payable within thirty (30) days of the invoice date.  An interest charge at the rate of one and a half percent (1.5%) per month shall be assessed against all late payments.  Interest under this Agreement shall not exceed the interest allowable under applicable law.

### Section 8.04   Relationship to Third-parties

Nothing herein contained shall be construed as affecting, diminishing or interfering with any rights or privileges previously conferred by Licensor, by contract or otherwise, to others not parties to this Agreement to use the Conduit System.   Nothing in this Agreement is intended to confer rights on any third party, as a third-party beneficiary or otherwise.

### Section 8.05   Assignment of Rights

Except as set forth below, neither Party may assign or transfer its rights and obligations under this Agreement, in whole or part, to a third party without the written consent of the other Party, which consent shall not be unreasonably withheld, conditioned, or delayed.  Licensor may sell, transfer, or assign its ownership interest in the Conduit or Duct provided that the purchaser, transferee, or assignee continues to be bound by the terms of this Agreement.  Licensee may sell, transfer, or assign its ownership in its Equipment provided that the purchaser, transferee, or assignee continues to be bound by the terms of this Agreement.

### Section 8.06   Survival of Liability or Obligations Upon Termination

Any termination of this Agreement shall not release either Party from any liability or obligations hereunder, whether of indemnity or otherwise, which may have accrued or may be accruing at the time of termination.

### Section 8.07   Interpretation

References to Articles and Sections are references to the relevant portion of this Agreement.  Headings are for convenience and shall not affect the construction of this Agreement.  Exhibits A - C are attached hereto and made a part hereof.

### Section 8.08   Severability

In the event that any of the terms, covenants or conditions of this Agreement, or the application of any such term, covenant or condition, shall be held invalid as to any person or circumstance by any court, regulatory agency, or other regulatory body having jurisdiction, all other terms, covenants or conditions of this Agreement and their application shall not be affected thereby, but shall remain in full force and effect; provided, in any such case, the Parties shall negotiate in good faith to reform this Agreement in order to give effect to the original intention of the Parties.

## Section 8.09    Prior Agreements; Amendments

This Agreement shall supersede all prior negotiations, agreements and representations, whether oral or written, between the Parties relating to the subject of this Agreement. This Agreement, including any Exhibits attached and referenced herein, constitutes the entire agreement between the Parties with respect to the subject matter hereof, and may not be amended or altered except by an amendment in writing executed by the Parties hereto.

## Section 8.10    Additional Representations and Warranties

Each Party warrants and represents to the other that it possesses the necessary corporate, governmental and legal authority, right and power to enter into this Agreement and to perform each and every duty imposed hereby.  Each Party also warrants and represents to the other that each of its representatives executing this Agreement, or submitting or approving an application made hereunder, is authorized to act on its behalf.

Each Party further warrants and represents that entering into and performing under this Agreement does not violate or conflict with its charter, by-laws or comparable constituent document, any law applicable to it, any order or judgment of any court or other agency of government applicable to it or any agreement to which it is a party and that this Agreement and any application approved hereunder, constitute valid, legal, and binding obligations enforceable against such Party in accordance with their terms.

## Section 8.11    Relationship of the Parties

Nothing contained herein shall be construed to create an association, joint venture, trust, or partnership, or impose a trust or partnership covenant, obligation, or liability on or with regard to either Party.  Each Party shall be individually responsible for its own covenants, obligations, and liabilities under this Agreement and otherwise.

## Section 8.12    Joint Drafting

The Parties acknowledge that this Agreement (including the Exhibits, Appendices and Annexes hereto) has been drafted jointly by the Parties and agree that this Agreement will not be construed against either Party as a result of any role such Party may have had in the drafting process.

## Section 8.13    Remedies Cumulative; Specific Performance

Except as provided otherwise in this Agreement, all rights and remedies granted to each Party under this Agreement are cumulative and in addition to, and not in lieu of, any other rights or remedies otherwise available to such Party at law or in equity.  The Parties agree that irreparable damage would occur in the event any provision of this Agreement were not performed in accordance with the terms hereof and that a Party shall be entitled to specific performance of the terms hereof in addition to any other remedy at law or in equity, including monetary damages, that may be available to it.

## Section 8.14    Further Assurances

In addition to any other obligations set forth in this Agreement, each Party agrees to take such actions (including the execution, acknowledgment and delivery of documents) reasonably requested by the other Party for the implementation or continuing performance of this Agreement.

## Section 8.15    Counterparts; Signatures

This Agreement may be executed in multiple counterparts, all of which taken together constitute one and the same instrument.  To the extent either Party to this Agreement uses an electronic signature, the Parties agree that such signature is binding and this Agreement constitutes a writing.

## ARTICLE IX.        CONTRACT TERM

Section 9.01    Effective Date

This Agreement shall take effect on the Effective Date.

Section 9.02    Term and Termination

This Agreement shall remain in full force and effect for a period of fifty (50) years from the Effective Date and may then be renewed for successive ten (10) year periods upon the written consent of the Licensor, unless Licensee is no longer operating its network within Orem.  Unless Licensee transfers its Attachments to a third party with which Licensor has a separate attachment agreement, upon termination, (i) existing Attachments will continue to be subject to the terms of this Agreement until such Attachments are removed, (ii) Licensee shall use commercially reasonable efforts to commence removal of its attachments, and (iii) unless Licensor grants an extension of time, all attachments must be removed at Licensee's cost within ninety (90) days after the effective date of termination.

## ARTICLE X.        INDEMNIFICATION; LIMITATION OF LIABILITY

Section 10.01  Indemnification by Licensee

Licensee shall defend, solely at Licensee's expense, Licensor and its officers, directors, managers, council members, personnel, permitted successors and permitted assigns (collectively, the "Licensor Indemnified Parties"), against all claims, lawsuits, actions, causes of action, demands or proceedings ("Claims") and shall indemnify and hold harmless Licensor Indemnified Parties from any losses, disbursements, fines, fees, penalties, taxes, settlements, awards, damages, costs, expenses, liabilities, or obligations of any kind, ("Losses") arising out of, relating to, or otherwise in respect of any of the following:

(a)   Claims for bodily injury, death, or damage to tangible personal or real property to the extent:  (i) proximately caused by the negligence or willful acts or omissions of Licensee, its personnel and its contractors; or (ii) resulting proximately from Licensee's failure to perform its obligations under this Agreement;

(b)   Claims arising from Licensee's breach of any representation or warranty in this Agreement or from Licensee's deviation from Licensor directions or requirements;

(c)   Claims arising from any failure by Licensee or its contractors to comply with all applicable safety codes and requirements, including NESC compliance, with respect to attachments of Licensee;

(d)   Claims that any Licensee personnel is an employee of Licensor, including Claims arising out of Licensee's failure to promptly pay any Licensee personnel for its services, materials, facilities, equipment or labor; and

(e)   Licensee's fraud, violation of law, wrongful misconduct or misrepresentations.

Section 10.02  Procedure

Licensor shall give written notice to Licensee promptly after Licensor learns of the existence of Claim for which Licensor seeks indemnification; provided, however, the failure to give such notice shall not affect the rights of Licensor, except and only to the extent the Licensee is prejudiced by such failure. The Licensee shall have the right to employ counsel reasonably acceptable to the Licensor to defend against any such Claim. If such counsel will represent both Licensee and Licensor, there may be no

UVU P. 00128

conflict with such counsel's representation of both. The Licensee must acknowledge in writing its obligation to indemnify the Licensor for the entire amount of any Loss relating thereto. No settlement of a Claim may seek to impose any liability or obligation upon the Licensor other than for money damages. The Licensor will use commercially reasonable efforts to fully cooperate in any such action at its own cost, shall make available to the Licensee any books or records useful for the defense of any such Claim, and shall reasonably make available its personnel with respect to defense of the Claim. If the Licensee fails to acknowledge in writing its obligation to defend against or settle such Claim within fifteen (15) days after receiving notice thereof from the Licensor (or such shorter time specified in the notice as the circumstances of the matter may dictate), the Licensor shall be free to dispose of the matter, at the expense of the Licensee (but only if indemnification is adjudged to be proper), in any way in which the Licensor deems to be in its best interest.

## ARTICLE XI.        INSURANCE

### Section 11.01  Workers Compensation and Employer's Liability Acts

Licensee shall comply with all applicable worker's compensation and employer's liability acts and shall furnish proof thereof satisfactory to Licensor prior to placing Equipment on Licensor's Poles or in Licensor's Conduit System.

### Section 11.02  Licensee Maintenance of Insurance Coverage

Without limiting any liabilities or any other obligations of Licensee, Licensee shall, at its sole expense and prior to placing Equipment on Licensor's Poles or in Licensor's Conduit System, secure and continuously carry with insurers reasonably acceptable to Licensor the following insurance coverage:

> *Commercial General Liability insurance* with a minimum single limit of $1,000,000 to protect against and from all loss by reason of injury to persons, including Licensee's employees, Licensor's employees and all other third persons, or damage to property, including Licensor's property and the property of all other third-parties, based upon or arising out of Licensee's operations hereunder, including the operations of its contractors of any tier.

> *Business Automobile Liability insurance* with a minimum single limit of $1,000,000 for bodily injury and property damage with respect to Licensee's vehicles whether owned, hired or non-owned, assigned to or used in Licensee's operations hereunder.

> *Umbrella liability* with a minimum limit of $5,000,000 with up to a $50,000 deductible.

The policies required herein shall include (a) provisions or endorsements naming Licensor, its officers, employees, agents and volunteers as additional insured, and (b) a cross-liability and severability of interest clause.

The policies required herein shall include provisions that such insurance is primary insurance with respect to the interests of Licensor and that any other insurance maintained by Licensor is excess and not contributory insurance with the insurance required under this section and provisions that such policies shall not be cancelled or their limits of liability reduced without thirty (30) days prior written notice to Licensor. A certificate in a form satisfactory to Licensor certifying the issuance of such insurance shall be furnished to Licensor by Licensee.

UVU P. 00129

**ARTICLE XII.        FORCE MAJEURE**

Neither Party shall be subject to any liability or damages for inability to perform its obligations under this Agreement, except for any obligation to pay amounts when due, to the extent that such failure shall be due to causes beyond the reasonable control of either Party, including but not limited to the following: (a) the operation and effect of any rules, regulations and orders promulgated by any commission, municipality, or governmental agency of the United States, or subdivision thereof (so long as the claimant Party has not applied for or assisted in the application for, and has opposed where and to the extent reasonable, such government action); (b) restraining order, injunction or similar decree of any court; (c) war or act of terrorism; (d) flood; (e) earthquake; (f) act of God; (g) civil disturbance; or (h) strikes or boycotts; provided, the Party claiming Force Majeure shall make every reasonable attempt to remedy the cause thereof as diligently and expeditiously as possible.  Time periods for performance obligations of Parties herein shall be extended for the period during which Force Majeure was in effect.

**ARTICLE XIII.        NOTICE**

Except as otherwise provided herein, any notice required, permitted or contemplated hereunder shall be in writing, shall be addressed to the Party to be notified at the address set forth below or at such other address as a Party may designate for itself from time to time by notice hereunder, and shall be transmitted by United States mail, by regularly scheduled overnight delivery, by personal delivery, or by email:

To Licensor:
Attn: City Engineer
56 N. State St.
Orem, UT 84057

**With copies to (which shall not constitute notice):**
Attn: City Attorney
56 N. State St.
Orem, UT 84057

To Licensee:
FirstDigital Telecom
90 South 400 West, Suite M100
Salt Lake City, UT  84101

fax no.:(801) 456-1010
Email: bbalmforth@firstdigital

**With a copy to (which copy will not constitute notice):**[address of Licensee Legal Staff]


[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

UVU P. 00130

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed by their duly authorized officers as of the date first herein written.

City of Orem                                    FirstDigital Telecom

By: _____          By: _____
_____, City Manager

ATTEST:                                        ATTEST:

_____, City Recorder                      [Company] Secretary



14

**EXHIBIT A**
**FEE SCHEDULE**

1) Conduit and Duct.
   a. The annual rental rate charged by Licensor per linear foot of attachment in its Conduit and Duct at the effective date is $0.30, which is the amount that Licensee will pay per linear foot of Attachment in Conduit and Duct from the Effective Date (the "Conduit and Duct Rental Fee").
   b. Licensor may decrease the Conduit and Duct Rental Fee at any time and in any amount.
   c. Licensor may increase, only after five years from the date the agreement is signed, the Conduit and Duct Rental Fee after providing written notice to Licensee. Licensor may increase the rental fee on an annual basis, provided that the percentage increase does not exceed the percentage increase in the CPI Index (as defined below) since the signing of the Agreement. CPI Index shall mean the Consumer Price Index presently designated as the United States Department of Labor, Bureau of Labor Statistics Consumer Price Index for all Urban Consumers, U.S. City Average, as reported in October prior to the implementation of the Conduit and Duct Rental Fee increase.

# EXHIBIT B
# FORM OF ATTACHMENT APPLICATION

UVU P. 00133

## EXHIBIT C

## CONDUIT AND DUCT TO BE OCCUPIED

Below is a summary of the proposed conduit and duct to be occupied by FirstDigital Telecom.  The location and footage is presented by FirstDigital and to be verified by the City of Orem.

1)   Orem Boulevard (From 800 North to Center Street) 6,360 feet.

2)   State Street (From Center Street to University Parkway) 9,168 feet.

Total Length 15,528 ft.

UVU P. 00134

SEE SHEET 27

SEE SHEET 16

SEE SHEET 16

UDOT / FIRST DIGITAL PROVO-OREM BUILD

| SHEET # | | | | PROJECT NAME: | OWNER: | | |
|---|---|---|---|---|---|---|---|
| 26 OF 30 | REVISION # - | DATE: 5/16/2017 | SCALE: 1" = 210' | **UDOT - FIRST DIGITAL PROVO-OREM** | **FIRSTDIGITAL** | | |
| | DATE: | | | UNIVERSITY AVE, 800 N. 1600 N. GENEVA RD | | | |
| | | | | OREM BLVD, STATE STREET | | | |
| | | | | LOCATION: PROVO & OREM, UTAH | | | |

PJUVU P. 00135

SEE SHEET 28





SEE SHEET 26

UDOT / FIRST DIGITAL PROVO-OREM BUILD

**PROJECT NAME:**
U DOT / FIRST DIGITAL PROVO-OREM
UNIVERSITY AVE, 800 N - 1600 N, GENEVA RD
OREM BLVD, STATE STREET
LOCATION: PROVO & OREM, UTAH

**OWNER:**
FIRSTDIGITAL

SHEET #
27 OF 30

UVU P. 00136

SEE SHEET 29

SEE SHEET 27

UDOT / FIRST DIGITAL PROVO-OREM BUILD

**PROJECT NAME:**
UDOT - FIRST DIGITAL PROVO-OREM
UNIVERSITY AVE, 800 N, 1600 N, GENEVA RD
OREM BLVD, STATE STREET

LOCATION: PROVO & OREM, UTAH

**OWNER:**
FIRSTDIGITAL

SHEET # 28 OF 30

UVU P. 00137

SEE SHEET 30

UDOT / FIRST DIGITAL PROVO-OREM BUILD

SEE SHEET 28

SHEET #
29 OF 30

REVISION #:
DATE:

DATE: 8/16/2017

SCALE 1" = 210'

**PROJECT NAME:**
UDOT / FIRST DIGITAL PROVO-OREM
UNIVERSITY AVE, 800 N, 1600 N, GENEVA RD
OREM BLVD, STATE STREET

LOCATION: PROVO & OREM, UTAH

**OWNER:**







JVU P. 00138



UDOT / FIRST DIGITAL PROVO-OREM BUILD

SEE SHEET 29

**PROJECT NAME:**
UDOT - FIRST DIGITAL PROVO-OREM
UNIVERSITY AVE, 800 N, 1600 N, GENEVA RD
OREM BLVD, STATE STREET
LOCATION: PROVO & OREM, UTAH

**OWNER:**
FIRSTDIGITAL

SHEET # 30 OF 30
DATE:
REVISION # :
DATE: 5/16/2017

JUVU P. 00139

# EXHIBIT F

A-06-0336



### CONDUIT SYSTEM
### LEASE/PURCHASE AGREEMENT

This Conduit System Lease/Purchase Agreement (this "Agreement") is made and entered into as of this 26 day of) Sept. , 2006, by and among the City of Orem ("City"), a Utah municipal corporation, and the Utah Telecommunication Open Infrastructure Agency ("UTOPIA"), an interlocal cooperative agency of the State of Utah organized under the Interlocal Cooperation Act, Title 11, Chapter 13, Utah Code Annotated 1953, as amended.

### RECITALS:

A.      The City owns an underground conduit system through which Network cabling systems can be pulled.

B.      The City is willing to lease, with an option to purchase, the Conduit System to house fiber Network cabling and innerduct during the term of this Agreement.

C.      UTOPIA wants to lease, with an option to purchase, the Conduit System to more efficiently deploy its Network within the City.

D.      The parties want to enter into this Agreement to set forth the terms and conditions of UTOPIA's lease, with an option to purchase, of the Conduit System.

### AGREEMENT:

NOW, THEREFORE, in reliance on the above recitals for and in consideration of the premises, provisions and covenants as set forth herein and other good and valuable consideration, the receipt and sufficiency of which is acknowledged, the City and UTOPIA hereby agree as follows:

1.      Definitions. Capitalized terms in the Agreement shall have the following meanings:

    a.    "Agreement" means this Agreement, as amended, and incorporates any Exhibits, Appendices, or other attachments referenced herein.

    b.    "Conduit System" means the City's underground system of conduits through which network cabling systems and other facilities can be installed, as more specifically described in Exhibits "A-1" and "A-2." The City owns conduit in rights-of-way other than those shown on Exhibits "A-1" and "A-2," and also owns additional conduit in the rights-of-way shown on Exhibits "A-1" and "A-2." For purposes of this Agreement, "Conduit System" includes only the conduit that is specifically listed on Exhibits "A-1" and "A-2." Conduit System does not include the 48-strand fiber specified in Section 2.c.

    c.    "UTOPIA's Network" or "Network" means and includes, without limitation, all cables, collocation space, conduits, innerducts, inside wiring, manholes, nodes, optical fiber strands, patch panels, splices, switches, transmitters, junctions,

ORIGINAL DOCUMENT
City of Orem Recorder's Office

UVU P. 00070

terminals, power sources, access portals, video gateways, fault alarm systems, structures, shelters, poles or pole line attachments, similar equipment, and all articles of personal property owned, leased or used by UTOPIA, directly or indirectly, for use in connection with its telecommunications system, as any or all of the same may be updated, supplemented, replaced or expanded, from time to time.

2.    <u>Lease of Conduit System</u>. The City hereby grants to UTOPIA the right to use the Conduit System for the purpose of deploying UTOPIA's Network pursuant to the following terms:

   a.   <u>Lease</u>. Except as provided in Section 2.d, during the Term, the City demises and leases to UTOPIA an exclusive indefeasible right to use ("IRU") the Conduit System as part of its Network, and UTOPIA leases the same from the City, including UTOPIA's right to use, occupy and operate the Conduit System pursuant to this Lease Agreement, in accordance with the provisions of this Agreement, to have and to hold under this Agreement unless sooner terminated as expressly provided herein. Nothing in this Agreement shall be construed to require UTOPIA to operate the Conduit System other than as the lessee hereunder or to exercise its right to purchase any or all of the System or any portion thereof as provided in this Agreement. The City warrants and covenants that it has a valid interest in and to the site on which the Conduit System is located and hereby leases the Conduit System to UTOPIA for the exclusive use of UTOPIA or sublessees of UTOPIA.

   b.   <u>Lease Payment</u>. In consideration of the IRU under Section 2.a, UTOPIA will pay the City the annual lease payment set forth in Exhibit B. The lease year shall run from September 1 of one year through August 31 of the following year. The initial payment of $37,216.34 is due upon execution of this Agreement. The initial payment was calculated as follows: $12,202.08 (the equivalent of an annual lease payment (1) as an inducement to the City to enter into this Agreement, and (2) to cover any usage of City conduit by UTOPIA prior to 9/1/05) + $12,202.08 (annual lease payment for 9/1/05 through 8/31/06) + $610.10 (5% interest for one year on annual lease payment from 9/1/05 through 8/31/06) + $12,202.08 (annual lease payment for 9/1/06 through 8/31/07.) The annual lease payment shall be paid in advance, on or before September 30 of the year for which the lease payment is owed.

   c.   <u>Covenant Not to Disturb Existing Fiber</u>. The parties recognize that the City has an existing 48-strand fiber ("City's Fiber") in the Conduit System on 1200 West from 400 North to Center Street. UTOPIA covenants that during the installation and maintenance of UTOPIA fiber in said portion of the Conduit System the City's Fiber will remain intact and undisturbed. UTOPIA shall not cut or remove the City's Fiber for any reason without the City's prior written consent. Notwithstanding any other provision in this Agreement, the City shall at all times

2

retain ownership and the right to use, maintain and control the 48-strand fiber specified in this Section.

d.  Purchase Option.  UTOPIA shall have, at its sole discretion, the right to purchase the Conduit System (the "Purchase Option") from the City by sending written notice to the City of UTOPIA's intent to exercise its Purchase Option not later than ninety (90) days before each anniversary of the Effective Date; provided, however, that UTOPIA shall in no event exercise such Purchase Option during the initial five (5) years of the Term.  Upon exercising the Purchase Option, UTOPIA shall have ninety (90) days from the date of the written notice to pay the City the applicable purchase price set forth in Exhibit "B," and shall continue to make the lease payments under Section b until the purchase price is paid to the City.  UTOPIA acknowledges that the purchase of the Conduit System does not give UTOPIA any ownership rights to the rights-of-way traversed by the Conduit, other than rights typically held by an entity using a public utility easement. UTOPIA agrees to follow the City's standard permitting, safety and construction requirements when working in a City right-of-way.

e.  Delivery of Documents.  The City covenants that it shall execute and deliver such documents as may be reasonably requested to further evidence the lease or purchase, as applicable, of the Conduit System to UTOPIA under this Section.

3.  Covenant to Maintain.  During the Term, UTOPIA, at its sole discretion and expense, shall be responsible to maintain the Conduit System.  The City, at its sole discretion and expense shall be responsible to maintain the 48-strand fiber specified in Section 2.c.  Upon exercising the Purchase Option UTOPIA shall be solely responsible, at its discretion and expense, to maintain the Conduit System notwithstanding the termination or expiration of this Agreement.

4.  Restrictions on Transfer of Conduit System.  Except as may be required by UTOPIA's financing, UTOPIA shall not transfer the IRU to any entity or person.  In the event of a permitted transfer under UTOPIA's financing obligations, all obligations of UTOPIA with respect to the Conduit System will transfer with such right.

5.  Insurance.  The following provisions shall apply to UTOPIA:

a.  Types. UTOPIA shall, at its own expense, procure and maintain the following types of insurance.  Any sub-contractor hired by UTOPIA to perform work on the Project shall also meet these insurance requirements.

i.  Commercial General Liability.  Commercial General Liability ("CGL") insurance with coverage that is at least as broad as the Insurance Services Office Commercial General Liability coverage ("occurrence" form).

3

    ii.    <u>Business Auto</u>. Business Auto insurance with coverage that is at least as broad as the Insurance Services Office Business Auto Coverage form.

    iii.    <u>Workers' Compensation and Employer's Liability</u>. Workers' Compensation insurance as required by the State of Utah and Employer's Liability Insurance.

b.    <u>Coverage Limits</u>. UTOPIA 's required insurance shall have the following minimum coverage limits:

    i.    <u>Commercial General Liability</u>. $2,000,000.00 combined single limit per occurrence for bodily injury, personal injury and property damage. If the policy contains a general aggregate limit, the general aggregate limit must apply separately to this Agreement or the general aggregate limit shall be $5,000,000.00.

    ii.    <u>Business Auto</u>. $5,000,000.00 combined single limit for bodily injury and property damage.

    iii.    <u>Workers' Compensation and Employer's Liability</u>. Workers' Compensation as required by the State of Utah and $500,000.00 per accident for Employer's Liability.

c.    <u>Deductibles</u>. Any deductibles or self-insured retentions must be declared to and approved by the City. At the City's option, the City may require that:

    i.    The insurer reduce or eliminate the deductibles or self-insured retentions as respects the City, its officers, officials, employees and volunteers; or

    ii.    UTOPIA procure a bond or letter of credit guaranteeing payment of any deductibles or self-inured retentions.

d.    <u>Policy Provisions</u>. The policies shall contain, or be endorsed to contain, the following provisions:

    i.    <u>Additional Insured</u>. The City and its officers, officials, employees and volunteers shall be listed as an additional insureds under the CGL and Business Auto policies. The coverage shall contain no special limitations on the scope of protection afforded to the City, its officers, officials, employees or volunteers.

    ii.    <u>Primary Insurance</u>. UTOPIA's insurance coverage shall be primary insurance. Any insurance or self-insurance maintained by the City shall be excess of UTOPIA's insurance and shall not contribute with it.

UVU P. 00073

iii.   Reporting. Any failure to comply with reporting provisions of the policies shall not affect coverage provided to the City, its officers, employees or volunteers.

iv.   Separate Application. UTOPIA's insurance shall apply separately to each insured against whom claim is made or suit is brought, except with respect to the limits of the insurer's liability.

v.   Waiver of Subrogation. The insurers shall waive, in writing, all rights of subrogation against the City, its officers, officials, employees and volunteers for losses arising from UTOPIA 's actions in performing (or failing to perform) this Agreement.

vi.   Cancellation. Each insurance policy required by this Agreement shall be endorsed to state that coverage shall not be suspended, voided, canceled, or reduced in coverage or in limits, except after thirty (30) days' prior written notice by certified mail, return receipt requested, has been given to the City. If  required insurance lapses, the City shall have the option of:

1.   Purchasing the insurance on behalf of UTOPIA and deducting  the insurance costs from the amount owed to UTOPIA ; or

2.   Terminating this Agreement.

e.   Certificates of Insurance.   UTOPIA shall provide the City with certificates of insurance and with original endorsements effecting coverage required by this Agreement.  The certificates and endorsements for each insurance policy shall be signed by a person authorized by that insurer to bind coverage on its behalf.  All certificates and endorsements shall be received and approved by the City before work commences.   The City reserves the right to require complete, certified copies of all required insurance policies, at any time.

6.   Disclaimer of Warranties.  EXCEPT AS PROVIDED IN SECTION 2.a, UTOPIA'S RIGHT TO USE THE CONDUIT SYSTEM IS PROVIDED ON AN "AS IS" AND "AS AVAILABLE" BASIS WITHOUT WARRANTIES OF ANY KIND, EITHER EXPRESS OR IMPLIED, INCLUDING, WITHOUT LIMITATION, WARRANTES OF TITLE, MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, OR NON-INFRINGEMENT.  NEITHER THE CITY NOR ITS EMPLOYEES, OFFICERS, CONTRACTORS, OR AGENTS WARRANT THAT THE USE OF THE CONDUIT SYSTEM WILL BE UNINTERRUPTED, SECURE, OR PRODUCE PARTICULAR RESULTS, PROVIDED THAT NEITHER THE CITY NOR ITS EMPLOYEES, OFFICERS, OR CONTRATORS, DAMAGE OR DESTROY THE CONDUIT SYSTEM.

UVU P. 00074

7.    Indemnification.  UTOPIA shall indemnify, defend, and hold harmless the City, its employees, officers, contractors, and agents from and against any and all damages, losses, liabilities, suits, actions, demands, proceedings (whether legal or administrative), and expenses (including, without limitation, reasonable attorneys' fees) arising from or related to UTOPIA's use of the Conduit System.  City shall indemnify, defend, and hold harmless UTOPIA from and against any and all damages, losses, liabilities, suits, actions, demands, proceedings (whether legal or administrative), and expenses (including, without limitation, reasonable attorneys' fees) arising from or related to use of the Conduit System by City.

8.    Limitation of Liability.  NOTWITHSTANDING ANY OTHER PROVISION OF THIS AGREEMENT TO THE CONTRARY, IN NO EVENT, WHETHER IN CONTRACT OR IN TORT (INCLUDING BREACH OF WARRANTY, NEGLIGENCE, MISCONDUCT AND STRICT LIABILITY IN TORT), SHALL EITHER PARTY BE LIABLE FOR ECONOMIC LOSSES OR COSTS, OR INDIRECT, CONSEQUENTIAL, EXEMPLARY, PUNITIVE OR SPECIAL DAMAGES EVEN IF SUCH PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES IN ADVANCE.

9.    Governmental Immunity.  Notwithstanding any other provisions in this Agreement, the parties retain their respective rights and immunities under the Utah Governmental Immunity Act, Title 63, Chapter 30d, Utah Code Annotated 1953, as amended.

10.   Force Majeure.  Neither party shall be liable for delay or failure to perform any of its obligations under this Agreement if the delay or failure results from acts of God, fire, explosion, flood, war, riots, acts of terrorism, acts of Government, sabotage, civil commotion, labor disruptions or shortages, severe weather conditions, or any other events or circumstances which are beyond its reasonable control.

11.   Term and Termination.  The Term of this Agreement shall commence on September 1, 2005 and shall continue for a period of twenty (20) years.  This Agreement may only be terminated: (i) by the mutual written agreement of the parties; (ii) upon UTOPIA's exercise of its purchase option pursuant to Section 2.d; (iii) upon UTOPIA's non-payment of the lease payments pursuant to Section 2.b.; or (iv) upon UTOPIA's failure to perform any other requirement of this Agreement,  after first being given written notice from the City detailing the non-performance and then at least 90 days from the date of the written notice to cure the non-performance.

12.   Miscellaneous.

      a.   Amendment.   This Agreement may not be changed, modified, amended or supplemented except by a written instrument signed by all parties against whom such instrument shall be enforced.

UVU P. 00075

b.  <u>Governing Law</u>.    This Agreement shall be construed in accordance with, and governed in all respects by, the laws of the State of Utah, without giving effect to principles of conflict of laws.

c.  <u>Jurisdiction and Venue</u>.    For all litigation which may arise with respect to this Agreement, the parties irrevocably and unconditionally submit (i) to the non-exclusive jurisdiction and venue (and waive any claim of forum nonconvenience) of the United States Federal District Court for the District of Utah if in federal court or the Fourth District Court of the State of Utah if in state court.

d.  <u>Assignment</u>.  This Agreement shall benefit and be binding upon the parties hereto and their respective successors and assigns.

e.  <u>Costs</u>.    Each party shall be responsible for its own costs, including legal fees, incurred in negotiating and finalizing this Agreement.

f.  <u>Counterparts</u>.    This Agreement may be signed in counterparts and delivered by facsimile transmission, all of which counterparts together shall constitute one agreement and each of which shall constitute an original copy.

g.  <u>Severability</u>.    In the event any one or more of the provisions contained herein shall, for any reason, be held to be invalid, illegal, or unenforceable in any respect, such invalid, illegal or unenforceable provision(s) shall be curtailed, limited, construed, or eliminated to the extent necessary to remove such invalidity, illegality, or unenforceability and the remaining provisions of this Agreement shall not be affected thereby.

h.  <u>Relationship of Parties</u>.    The parties reserve no control whatsoever over the employment, discharge, compensation of or services rendered by the employees or contractors of each other. The parties acknowledge that they are independent contractors, and no agency, partnership, joint venture or employee-employer relationship is intended or created by this Agreement.  Neither party shall have the power to obligate or bind the other party except as explicitly set forth herein.

i.  <u>Entire Agreement</u>. This Agreement sets forth the final, complete and exclusive agreement of the parties relative to the subject matter hereof and supersedes all prior and contemporaneous understandings and agreements relating to its subject matter.

j.  <u>Multiple Copies</u>.    Each copy of this Agreement that is signed, by original or facsimile signature, by both parties shall be deemed an original thereof.

k.  <u>Headings</u>.  The article and section headings and the table of contents used in this Agreement are for reference and convenience only and shall not enter into the interpretation of this Agreement.

UVU P. 00076

l.  <u>Third Party Beneficiaries</u>.  This Agreement shall not be deemed to create any rights in, or duties or liabilities to, or any standard of care with reference to, or to grant remedies to persons or entities not a party to this Agreement.

m.  <u>Waivers</u>.  The failure by either party at any time or times hereafter to require strict performance by the other of any of the undertakings, agreements or covenants contained in this Agreement shall not waive, affect or diminish any right of such party to demand strict compliance and performance therewith.  None of the undertakings, agreements or covenants of the parties under this Agreement shall be deemed to have been waived unless such waiver is evidenced by an instrument in writing signed by the party to be charged specifying such waiver.

n.  <u>Notices</u>.  Any and all notices provided pursuant to the terms of this Agreement, shall be hand delivered against a receipt or sent, postage prepaid, registered or certified mail, return receipt requested, or express delivery, as follows (or to such other address as may be subsequently provided):

If to the City, to:

City of Orem
Attn: City Manager
56 N. State St
Orem, UT 84057

With a copy to:

City of Orem
Attn: City Attorney
56 N. State St.
Orem, UT 84057

If to UTOPIA, to:

UTOPIA
Attn: Executive Director
1385 West 2200 South, #302
West Valley City, Utah 84119

With a copy to:

UTOPIA
Attn: General Counsel
1385 West 2200 South, #302
West Valley City, Utah 84119

UVU P. 00077

Such addresses may be changed by notice to the other party given in the same manner as above provided.

*(Signature page to follow)*

UVU P. 00078

IN WITNESS WHEREOF the parties have executed this Agreement as of the Effective Date above set forth.

UTOPIA:                                                CITY OF OREM:

_____                               _____
Paul T. Morris, Executive Director                     By: JAMES A. REAMS
                                                       Title: CITY MANAGER

ATTEST:                                                ATTEST:

_____                               _____
Secretary                                              City Recorder

APPROVED AS TO FORM:                                   APPROVED AS TO FORM:

_____                               _____
UTOPIA General Counsel                                 City Attorneys' Office

10

**Exhibit A-1**

UVU P. 00080

# City of Orem



**Description:**

| Segment | # Feet | Conduit Type | Location |
|---------|--------|--------------|----------|
| A | 5652 | One 1 1/4" conduit | 800 N to 1600 N along 1200 W |
| B | 2852 | One 2" conduit | Center St to 400 N along 1200 W |
| C | 2567 | One 1 1/4" conduit | 800 W to 1200 W along Center St |
| | 11,071 | *Total Feet* | |

**Legend**

☐ Parcels

▨ Existing Orem City Conduit

## Exhibit A-2

UVU P. 00082

# City of Orem

| Segment | Feet | Conduit Type | Date Used | Location |
|---|---|---|---|---|
| D | 7197 | One 1 1/4" conduit | Aug-05 | 800 W to 300 E along Center |
| E | 1476 | One 1 1/4" conduit | Nov-05 | 620 N to 400 N along State |
| | 8673 | *Total Feet* | | |

Legend

☐ Parcels

▬ OREM CITY



UVU P. 00083

# City of Orem

| Segment | Feet | Conduit Type | Date Used | Location |
|---|---|---|---|---|
| F | 84 | One 2" conduit | Sep-04 | Crossing 400 S along 800 W |
| G | 2064 | One 2" conduit | Jan-06 | Crossing I-15 along 1200 S |
| H | 8153 | One 1" conduit | Sep-05 | Center to 1000 S along State |
| I | 264 | One 1 1/4" conduit | Sep-05 | Crossing State along 800S |
| | 10,565 | Total Feet | | |



UVU-P_00084

EXHIBIT "B"

LEASE PURCHASE SCHEDULE

Annual lease payment:            $12,202.08

| Anniversary | Purchase Option | Cumulative Amt Paid |
|---|---|---|
| 1-Sep-06 | na | $37,216.34 |
| 1-Sep-07 | na | $49,418.42 |
| 1-Sep-08 | na | $61,620.50 |
| 1-Sep-09 | na | $73,822.58 |
| 1-Sep-10 | $183,031.20 | $86,024.66 |
| 1-Sep-11 | $170,829.12 | $98,226.74 |
| 1-Sep-12 | $158,627.04 | $110,428.82 |
| 1-Sep-13 | $146,424.96 | $122,630.90 |
| 1-Sep-14 | $134,222.88 | $134,832.98 |
| 1-Sep-15 | $122,020.80 | $147,035.06 |
| 1-Sep-16 | $109,818.72 | $159,237.14 |
| 1-Sep-17 | $97,616.64 | $171,439.22 |
| 1-Sep-18 | $85,414.56 | $183,641.30 |
| 1-Sep-19 | $73,212.48 | $195,843.38 |
| 1-Sep-20 | $61,010.40 | $208,045.46 |
| 1-Sep-21 | $48,808.32 | $220,247.54 |
| 1-Sep-22 | $36,606.24 | $232,449.62 |
| 1-Sep-23 | $24,404.16 | $244,651.70 |
| 1-Sep-24 | $12,202.08 | $256,853.78 |
| 1-Sep-25 | $1.00 | $269,055.86 |

UVU P. 00085

Client#: 4317 UTOPIA

# ACORD™ CERTIFICATE OF LIABILITY INSURANCE

DATE (MM/DD/YYYY)
12/07/06

| PRODUCER<br><br>Moreton & Company - Utah<br>709 East South Temple<br>Salt Lake City, UT 84102<br>801 531-1234 | THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. | |
|---|---|---|
| INSURED<br><br>UTOPIA<br>1385 W 2200 S Ste 302 Bldg F<br>West Valley City, UT 84119 | INSURERS AFFORDING COVERAGE | NAIC # |
| | INSURER A: Great American Insurance Co. | |
| | INSURER B: | |
| | INSURER C: | |
| | INSURER D: | |
| | INSURER E: | |

## COVERAGES

THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. AGGREGATE LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | ADD'L INSRD | TYPE OF INSURANCE | POLICY NUMBER | POLICY EFFECTIVE DATE (MM/DD/YY) | POLICY EXPIRATION DATE (MM/DD/YY) | LIMITS | |
|---|---|---|---|---|---|---|---|
| A | | GENERAL LIABILITY<br>X COMMERCIAL GENERAL LIABILITY<br>  CLAIMS MADE  X OCCUR<br><br>GEN'L AGGREGATE LIMIT APPLIES PER:<br>  POLICY   PRO-JECT   LOC | PAC7856501 | 12/01/06 | 12/01/07 | EACH OCCURRENCE | $1,000,000 |
| | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $100,000 |
| | | | | | | MED EXP (Any one person) | $10,000 |
| | | | | | | PERSONAL & ADV INJURY | $2,000,000 |
| | | | | | | GENERAL AGGREGATE | $2,000,000 |
| | | | | | | PRODUCTS - COMP/OP AGG | $2,000,000 |
| A | | AUTOMOBILE LIABILITY<br>  ANY AUTO<br>  ALL OWNED AUTOS<br>X SCHEDULED AUTOS<br>X HIRED AUTOS<br>X NON-OWNED AUTOS | CAP7856502 | 12/01/06 | 12/01/07 | COMBINED SINGLE LIMIT (Ea accident) | $1,000,000 |
| | | | | | | BODILY INJURY (Per person) | $ |
| | | | | | | BODILY INJURY (Per accident) | $ |
| | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | GARAGE LIABILITY<br>  ANY AUTO | | | | AUTO ONLY - EA ACCIDENT | $ |
| | | | | | | OTHER THAN   EA ACC<br>AUTO ONLY:    AGG | $ |
| A | | EXCESS/UMBRELLA LIABILITY<br>X OCCUR   CLAIMS MADE<br><br>  DEDUCTIBLE<br>X RETENTION  $ 10,000 | UMB7856503 | 12/01/06 | 12/01/07 | EACH OCCURRENCE | $5,000,000 |
| | | | | | | AGGREGATE | $5,000,000 |
| | | | | | | | $ |
| | | | | | | | $ |
| | | WORKERS COMPENSATION AND EMPLOYERS' LIABILITY<br>ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED?<br>If yes, describe under SPECIAL PROVISIONS below | | | | WC STATU-TORY LIMITS   OTH-ER | |
| | | | | | | E.L. EACH ACCIDENT | $ |
| | | | | | | E.L. DISEASE - EA EMPLOYEE | $ |
| | | | | | | E.L. DISEASE - POLICY LIMIT | $ |
| | | OTHER | | | | | |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES / EXCLUSIONS ADDED BY ENDORSEMENT / SPECIAL PROVISIONS
**Verification of General Liability and Auto Liability coverage for Utah Telecommunication Open Infrastructure Agency**

| CERTIFICATE HOLDER | CANCELLATION Ten Day Notice for Non-Payment of Premium |
|---|---|
| City of Orem<br>56 North State Street<br>Orem, UT 84057 | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, THE ISSUING INSURER WILL ENDEAVOR TO MAIL __30__ DAYS WRITTEN NOTICE TO THE CERTIFICATE HOLDER NAMED TO THE LEFT, BUT FAILURE TO DO SO SHALL IMPOSE NO OBLIGATION OR LIABILITY OF ANY KIND UPON THE INSURER, ITS AGENTS OR REPRESENTATIVES.<br>AUTHORIZED REPRESENTATIVE<br>_Kerry Oldroyd_ |

UVU P. 00086

ACORD 25 (2001/08) 1 of 2    #S80402/M80398    RUTNI    © ACORD CORPORATION 1988

# IMPORTANT

If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must be endorsed. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

## DISCLAIMER

The Certificate of Insurance on the reverse side of this form does not constitute a contract between the issuing insurer(s), authorized representative or producer, and the certificate holder, nor does it affirmatively or negatively amend, extend or alter the coverage afforded by the policies listed thereon.

UVU P. 00087